## PEOPLE *v.* SCHWARTZ.

1. CRIMINAL LAW—MANSLAUGHTER—INFORMATION—FAILURE TO INDORSE EYEWITNESSES—NEW TRIAL.

In a prosecution for involuntary manslaughter in the killing of a boy of the age of 3 years and 8 months by plaintiff's striking him with his automobile while driving at an alleged unlawful and dangerous rate of speed upon a public street, where the question of the failure of the prosecution to indorse on the information the names of certain alleged eyewitnesses of the accident, and to produce, swear and examine them as witnesses was raised for the first time on motion for a new trial, and where

On the question of homicide by negligent operation of automobile, see notes in 30 L. R. A. (N. S.) 458; 33 L. R. A. (N. S.) 403, L. R. A. 1918B, 954.

On negligence of child in running in front of automobile, see note in 26 L. R. A. (N. S.) 435.

the claim rested solely in the statement and claim of counsel, not being supported by affidavits of said witnesses, whose names were not disclosed, the motion for a new trial was properly denied.

2. SAME—WITNESSES—TRIAL.

Defendant's claim that the testimony of the principal witness for the prosecution, who was a foreigner and not well acquainted with the English language, was misapprehended by the jury and the court and resulted in an erroneous verdict of guilty, *held*, not supported by the record.

3. SAME—WITNESSES—COMPETENCY—RATE OF SPEED.

A witness who testified that he was a train director, had ridden in automobiles, was able to judge the speed at which they were traveling, and that he saw defendant coming towards him at the time of the accident, was properly permitted to testify as to the speed of the automobile; the weight of his testimony being for the jury.

4. SAME—EVIDENCE—SUFFICIENCY—DIRECTED VERDICT.

Under the evidence, the trial judge was not in error in refusing to direct a verdict for the defendant, or in refusing to set aside the verdict of guilty as unsupported by competent evidence, or as against the great weight of the evidence.

5. APPEAL AND ERROR—ARGUMENT OF COUNSEL—EXCEPTIONS.

In a prosecution for involuntary manslaughter, where counsel for defendant contented himself with taking exception to particular portions of the argument of the assistant prosecuting attorney, without asking for, or obtaining a ruling thereon by the court, such exceptions cannot be considered on error.

6. TRIAL—MANSLAUGHTER—CRIMINAL LAW—INSTRUCTIONS.

Instructions of the court sufficiently informing the jury that in order to warrant a conviction of manslaughter it must appear that the death of the person was the result of the conduct of the defendant, in violation of the statute, *held*, not erroneous, in the absence of a request for a more explicit charge upon the subject of the application of the statute regulating the operation of motor vehicles upon a public highway (1 Comp. Laws 1915, §§ 4817, 4824).

Error to recorder's court of Detroit; Jeffries (Edward J.), J.   Submitted June 16, 1921.   (Docket No. 100.)   Decided July 19, 1921.

Hugo W. Schwartz was convicted of involuntary manslaughter, and sentenced to not less than 1 year in the State prison at Jackson.   Affirmed.

*Edward J. McCarthy,* for appellant.

*Merlin Wiley,* Attorney General, *Paul W. Voorhies,* Prosecuting Attorney, and *John V. Brennan,* Assistant Prosecuting Attorney, for the people.

STONE, J.   This case is here upon writ of error to review the trial, conviction and sentence of the defendant upon an information in the recorder's court of the city of Detroit, charging him with the crime of involuntary manslaughter in the killing and slaying of one John Janosz, an infant of the age of 3 years and 8 months, at the city of Detroit, on July 11, 1919, the information charging that the defendant, at the time and place named, did wilfully, unlawfully, feloniously, wantonly, negligently and recklessly run, drive, propel and operate a certain motor vehicle, to wit, an automobile of great weight, size and power, in and upon and along a certain road and public highway in the city of Detroit, to wit, Carbon avenue, at about the hour of 5 o'clock in the afternoon of the said day, at a great, unusual, reckless and dangerous rate of speed, to wit, at the rate of 30 miles per hour, or thereabouts, and in a manner likely to endanger the lives of persons passing in, on, across or about said street and highway; and so did then and there and thereby, as aforesaid, in the commission of said unlawful act, unlawfully and feloniously run, drive and propel said motor vehicle against, upon and over one John Janosz, and so did then and there and

thereby, as aforesaid, unlawfully and feloniously inflict and cause to be inflicted upon said John Janosz, divers and mortal wounds and injuries, of which mortal wounds and injuries so inflicted as aforesaid, he the said John Janosz, at the said city of Detroit, in the county aforesaid, on the 11th day of July, A. D. 1919, did die.

There are 42 assignments of error. We shall not attempt to consider each one separately, but shall endeavor to follow the statement of errors relied upon in appellant's original brief. Unfortunately appellant's counsel has failed to make a statement of the case in compliance with the rules of this court, in that such statement is argumentative, speculative and supposititious.

Upon the trial, which occurred in June, 1920, there was direct and positive evidence in the testimony of Joe Gibrys, corroborated by other circumstances, connecting the defendant with the death of the child. As this testimony is very much criticized by appellant's counsel we deem it best to set forth the substance of it. He was a foreigner—a native of Poland —who spoke our language brokenly. After giving his name, and stating that he had lived in Detroit for over 14 years the following occurred:

"*Q.* Now, Mr. Gibrys, just look at that blackboard there. Now, does that substantially represent the location where you live?

"*A.* Yes, sir. * * *

"*Q.* What is the character of that neighborhood, is that a residence district or a business district?

"*A.* That is a residence district. I was living there on the 11th of July, 1919, and I was home on the 11th of July, 1919. I knew John Janosz. I knew him from when he was born. He was a boy 3 years and 8 months old. On the 11th of July, 1919, he lived in the same house that I lived. I saw him alive on the 11th of July, 1919. I saw him dead on that same day, July 11, 1919. I picked him up dead. I saw an automobile

accident there shortly after 6 o'clock in the evening,
5 after 6 or 9 after 6, in the evening of that same day.
It was light, same like now.

"*Q.* Where were you at the time the accident oc-
curred?

"*A.* Well, I come from work and sit down on the
porch, wash up first and sit down on the porch and
take a rest.   Then that kid was in the yard.   I ride
a bicycle and I had a bicycle at the end of the lot.
That boy come to the bicycle and monkey around with
my bicycle.   So I says, 'Get away from the bicycle,'
and that kid go out of the yard and go on the side-
walk, goes straight down there, takes my boy's wagon,
and goes straight down to Carbon.   *   *   *

"*Q.* Now, who was on the other side of the street?

"*A.* My two boys and his two brothers and that
third one that got killed.   He leave the wagon here
on the sidewalk and goes on past here, and I see the
automobile is coming from here from the Carbon
Works—it was just that—go fast—the motor make
noise.

"*Mr. Kelly:* I ask that be stricken out, if your honor
please.

"*The Court:* 'Go fast' will be stricken out.

"*Prosecutor:* Just a minute, leave that out.

"*The Court:* Never mind that.

"*Q.* Go ahead.

"*A.* Yes, go fast, and I look at the automobile and
at my boys, so I think it was going to be something.
I see them boys go past here.   So I looked at the
boy get hurt with the automobile.   I ran from here.
I was standing here on the empty lot when I seen
that, and goes out my yard from the gate and goes
in here for the boy to pick him up.

"*The Court:* What hit him, anything?

"*A.* Automobile with the mud guards hit him.   I
thought he was not dead.

"*Q.* Now, taking that as representative of the
width of the street, about where was the boy in the
street when he was struck?

"*A.* Well, he was about—goes over a third, about
over a third of the street.

"*Q.* Well, was he over on this side?

"*A.* On this side.   Them boys was playing in here,

and I seen the automobile.    So they didn't blow their horn or nothing.

"*Q.* Now, after the automobile struck the boy, what, if anything, did it do?    Just talk to the jury, will you, please?

"*The Court:* What did the automobile do?

"*A.* He goes right away, he runs same speed what he was, runs right away to Dearborn avenue, so fast he was that he was from here where that accident was, about 190 feet where the accident was, where I was—

"*The Court:* Dearborn road?

"*A.* Yes, the Dearborn road, where I was I guess only two lots, one is 40 and the other is 35, well, about 80 feet altogether.

"*Q.* Did you notice what kind of a car it was?

"*A.* I seen the car and everything; I seen the fellow that was driving and everything.

"*Q.* Who was driving the car?

"*A.* Well, that fellow right there, Mr. Schwartz.

"*Q.* Was anybody riding with him?

"*A.* Well, there was another fellow, but I did not pay any attention to him because I was too nervous.

"*Q.* What did he say about the horn?

"*A.* Yes.    He never blowed a horn on the kids or nothing, just run away.

"*Q.* Now, have you lived there ever since?

"*A.* Yes.    *    *    *

"*Q.* You say you picked the boy up?

"*A.* Yes, I picked the boy up.    If I knew the boy was killed, I would have had them fellows in the automobile catched, but I think the little kid get only hurt or something, so I look to pick up the kid; I don't pay any attention to the automobile, which way he goes."

There was further testimony of this witness tending to show that he saw defendant and his automobile standing in front of witness's house two or three days previous to the accident.    This last testimony was strenuously denied by the defendant; but there is no claim in the record that defendant was not there on the day of the accident.    In fact, defendant testified

that he was in that vicinity on the afternoon of the accident about the hour the little boy was killed. The whole testimony of the witness Gibrys is severely criticized by defendant's counsel and the claim is made that it was not understood by the court or jury. There is nothing in the record to sustain this claim. There is nothing upon the face of this testimony to stamp it with untruthfulness. The circumstances of the killing, the witness's anxiety for his own and the other children made him particularly attentive to just what occurred. There was no claim that any other automobile passed in the vicinity about the time of the injury. Defendant was positively identified as the driver of the car. There was testimony that immediately after the boy was struck defendant narrowly escaped hitting a gate post at the crossing in the immediate vicinity, as one witness testified: "He had to back up in order to go ahead."

As it is claimed by defendant's counsel that there was no evidence to warrant a conviction, and that the verdict was contrary to the great weight of the evidence, it is pertinent to say that when the defendant, about three hours after the injury, was interviewed and taken into custody by the police officers, his conversation with reference to the collision was evasive, and completely lacking in the element of frankness which would be expected from an innocent person. These circumstances were facts for the jury's consideration, and we only allude to them because of this claim of defendant's counsel.

Police Officer Carmack testified that when on the same evening he took the defendant in charge, and while on the way to the station, the defendant said to him:

"Now, Mr. Carmack, just as a brother in the lodge what would you tell them when you get into the station; would you tell them yes you had an accident,

or would you tell them to go to hell. I says, 'this is no place for to spring any lodge stuff on me, Mr. Schwartz; don't start anything like that for I won't stand by anybody in the case of murder or anything like that.' He says, 'Well, I will tell them to go to hell, then.' "

Police Officer Stevenson, who was present on the same occasion, testified that about 9 o'clock on that evening he had a conversation with defendant.

"I asked Mr. Schwartz if he hit any child the early part of the evening." He said he did not remember whether he did or not, but if he did, what of it? * * * I subsequently had a conversation with him from the Scotten avenue station to the headquarters. I asked him again if he remembered hitting that child at that time anywhere in that locality. Well, he says, if he did hit the child, it did not make any difference to him."

It is true that these claimed statements were denied by the defendant, but they were all in evidence and were for the consideration of the jury. We have found it difficult to follow appellant's counsel in his claimed statement of facts because of the injecting of speculative matters which are not in evidence, and are not supported by the record. We have concluded, however, to follow counsel in the order in which he makes a statement of the errors relied upon; they are as follows:

"(1) Failure of the prosecution to indorse on the information the names of certain eyewitnesses of the accident, and to produce, swear and examine these persons as witnesses."

This question was raised for the first time upon a motion for a new trial. That motion was not supported by the affidavit of any witness or person. A careful perusal of this record shows that the question was not raised upon the trial of the case. Neither was there any evidence that there was any *res gestæ*

witness whose name was omitted from the information. Counsel for defendant has spent much time in his brief and oral argument upon this subject and has cited many cases in this court. There ought not to be, and there is no question as to the state of the authorities upon this subject. They have been referred to time and again, and have been reviewed as recently as the case of *People* v. *Blazenzitz,* 212 Mich. 675. As that case is referred to by defendant's counsel in his supplemental brief, we invite perusal of it. It shows that the question was there presented upon a motion for a new trial, and the motion had the support of the affidavits of the proposed witnesses showing that they were *res gestæ* witnesses. Nothing of that kind appears in the instant case. The claimed eyewitnesses were undoubtedly the infant children referred to by the witness Gibrys. We repeat that there was no evidence in the record showing that any one of these children was an eyewitness of the injury, or transaction, or that they were in any sense *res gestæ* witnesses. The claim that they were such rests solely in the statement and claim of counsel.

In the *Blazenzitz Case* error was assigned on the ground of newly-discovered evidence, and because of the failure of the prosecuting attorney to indorse on the information the names of the *res gestæ* witnesses known to him to be such prior to the time of the trial, and because of the failure of the prosecution to call and produce such witnesses; and the affidavits of the proposed witnesses were also produced. The case is distinguished from the instant case in this regard. Here it was not made to appear that the children were *res gestæ* witnesses; their names even are not suggested by counsel. The trial record discloses no such facts, and it does not appear that the attorney for defendant, during the trial, the attorney for the people or the court considered that these children were eye-

witnesses, or even proper witnesses to be sworn in the fair determination of the case. We think there is no merit in the assignment of error raising this question.

It is the claim of counsel:

"(2) That the verdict was clearly based upon a misunderstanding of what the witness, Joe Gibrys, testified to relative to the manner in which the accident happened; such misapprehension existing not only in the minds of the jury, but apparently also of the prosecutor and the court; this testimony being the only testimony upon which a verdict of guilty could possibly have been based."

We have read with great care the lengthy argument of counsel upon this branch of the case. It consists largely of assertions unsupported by the record, and an attempt has been made to make much of the alleged misapprehension of facts as to how the accident occurred; and the claim that such misapprehension extended to the jury and the court. This he ascribes primarily to what he terms "hazy" testimony of the witness Joe Gibrys. We must say, in all frankness, that there is no valid ground for such contention. The witness Gibrys is apparently not well acquainted with the English language, but it appears that his testimony is plain of understanding, and its convincing force, it seems to us, was for the jury. Just where in the street the child was struck is not of controlling importance. The testimony showed, we think, convincingly, that the boy was killed by a passing automobile, and whether he was going or coming across the street could make no difference in determining the guilt or innocence of the party driving the machine. The jury were the sole judges of the facts, and there appears nowhere in the record any evidence or indication that they were under any misapprehension as to what occurred.

"(3)  The erroneous admission of witness Ralphton's testimony as to the speed of the automobile as it neared the railroad interlocker tower; same being the only testimony tending at all to show excessive speed; the witness not being qualified to testify thereto, and moreover, not having observed the automobile at the place of the accident."

The witness Ralphton was a train director employed in the tower at Dearborn avenue, Delray.  This witness testified that he saw the defendant that evening about 6 o'clock, between 6 and 6:05, coming down Carbon avenue in a green Oldsmobile.  He described his own position, and testified that the defendant was coming toward him.

"*The Court:* Well, what did you see?  You saw an automobile did you?

"*A.* Yes, sir.

"*Q.* What followed now?

"*A.* Well, he was running very fast.

"*The Court:* Wait a minute.  I will exclude that.

"*Q.* Just a minute.  Have you ever ridden in an automobile?

"*A.* Yes, sir.

"*Q.* Are you able to judge the speed?

"*A.* Yes, sir, I think I am.

"*Q.* To the best of your judgment, how fast would you say that car was going at the time you first saw it?

"*Mr. Kelly:* Wait a minute.  I object to that on the ground that it is incompetent, irrelevant and immaterial.  If your honor please, I do not believe that the witness has qualified at this time under the circumstances—

"*The Court:* Well, he has ridden in automobiles. He says he is a judge of the speed of automobiles.  I think he is qualified.  He may not be highly qualified, as highly qualified as some other speed—

"*Mr. Kelly:* Well, I will let my objection stand for the moment.  I will have a chance to cross-examine.

"*The Court:* All right.

"*Q.* How fast would you say, in your judgment, the car was going?

"*A.* 25 miles an hour, about."

Upon cross-examination he testified:

"*Q.* Now, remember that this car—I understand—but I mean, is your judgment—would your judgment be correct when the car is coming directly towards you, if you are an expert on the speed of automobiles?

"*A.* I do not say I can judge exactly.

"*Q.* I understand.  So it is almost impossible, in other words, to judge an automobile that is coming towards you, is it not?

"*A.* Well, you can tell the difference down to—

"*Q.* By the sound of the motor?

"*A.* Within ten miles of it anyway.

"*Q.* So this man may have been going 15 miles an hour?

"*A.* Oh, no.

"*Q.* Wait a minute.  He might have been going 25 or he might have been going 35, according to what you say?  You say you can judge within ten miles of it, is that right?

"*A.* Well, I possibly can."

We are of the opinion that the court did not err in receiving the testimony of this witness upon the question of the speed of the car.  It was a question entirely for the jury, and the weight of that testimony was for their consideration.  The witness was a train director, and his very occupation had more or less to do with the speed of vehicles.

"(4) The refusal of the court to direct a verdict for the defendant, and his refusal or failure to set aside the verdict of the jury as unsupported by competent evidence, or against the great weight of the evidence."

We have read this entire record with great care because of the importance of the case to the defendant. We are unable to say that the court erred in refusing to direct a verdict for the defendant, or in the refusal or failure to set aside the verdict of the jury as unsupported by competent evidence, or as against the

great weight of the evidence. It is true that the defendant and his companion testified that they saw no children in the street and were not aware that the automobile had injured any child, or did any injury at all on the occasion. They do not deny that they were in that vicinity about the time described by the people's witnesses. In view of the positive testimony of the witness, Joe Gibrys, above quoted, which tends to show that no care was exercised by the defendant in the operation of his car, that he was driving at a high rate of speed in a residential district, the rate of speed at which the defendant was driving immediately thereafter, a few feet away from the scene of the injury, and all the circumstances surrounding the case, we are not prepared to say that the court erred in the respect here complained of. To so hold would be to say that in every case where there was a conflict of testimony a case ought not to be submitted to the jury. We have repeatedly held that it is only in exceptional cases that we will interfere with the holding of the trial court upon the question of setting aside a verdict because the same is contrary to the weight of the evidence. We think the record discloses sufficient evidence to warrant submission to the jury.

"(5) Failure of the court to check the assistant prosecuting attorney in his prejudicial argument based upon a misunderstanding and misstatement of the testimony and of the law, and appealing to the sympathy, passion and prejudice of the jury; also the failure of the court afterwards to state to the jury that said argument was unfounded, improper, inaccurate and misleading and to endeavor to correct the harm wrought thereby."

Here again, counsel is claiming that the jury, the court and the prosecution, misunderstood the testimony of Joe Gibrys, the main witness in the case.

We shall not here produce, but have read carefully the argument complained of. We are not even prepared to say that the same was erroneous or prejudicial. Some latitude must be allowed to counsel in the discussion of testimony, and what is claimed for it, even by the prosecuting attorney. The controlling infirmity in the position of defendant's counsel here is, that no ruling of the court was asked for or made upon this subject. Counsel for defendant contented himself with taking exception to particular portions of the argument of the assistant prosecuting attorney without asking for or obtaining a ruling thereon by the court. Under repeated rulings of this court such exceptions cannot be considered. *People* v. *Sartori,* 168 Mich. 308, 317, and numerous cases there cited. We might call attention to a number of more recent decisions, but this rule is so well established in this court that it hardly needs citation of the authorities. We therefore dismiss that branch of the subject.

"(6) Errors in the court's instructions to the jury; particularly the failure to eliminate the question of speed of the car; the failure to instruct them they must be satisfied the defendant was aware he was exceeding the speed limit; and the failure to instruct them that defendant could not be found guilty unless his unlawful act, or grossly negligent act, was the proximate cause of the child's death, especially considered in connection with his erroneous instruction to the jury as to contributory negligence, which, in effect states a contrary rule."

We quote the following from the charge of the court:

"Involuntary manslaughter, under the common law, is defined as follows: Where a person, in the doing of an act which in itself is unlawful, but not amounting to a felony, by accident kills another person.

"The theory upon which the people prosecute this defendant is this: * * * That in the driving of an automobile, that it was at such a rate of speed and

under such circumstances,—if the defendant killed the child—as would amount to gross and wanton and criminal negligence, not merely the lack of exercise of due care.   *   *   *

"Now, the mere fact of hitting the child, gentlemen of the jury, in itself does not constitute the guilt. There must be in addition to that such acts as would be utterly wanton and cruel in their disregard of the rights of other people upon the street.

"Now, the law of this State provides that a person shall not run a motor vehicle in the residential sections of an incorporated city at more than 15 miles an hour, and in the business section at not more than 10 miles an hour.   The testimony shows in this case, gentlemen of the jury, because one of the witnesses, and the only one that did testify on that point, that it was a residential district, and, I suppose the limit of speed would be 15 miles an hour.

"Now, then, if you find that the defendant was the person that killed the child, the limit of lawful speed upon that public highway would be not more than 15 miles an hour, but the mere fact that there was more speed than that, in itself, gentlemen of the jury, would not justify you in convicting him, unless, in addition to that, and under all the circumstances, the condition of the street, the hour and the time and the traffic and all of that considered—unless in addition to that his conduct was utterly careless and abandoned and wanton and in utter disregard of the rights of other people or pedestrians upon the public highway.

"Now, gentlemen of the jury, you must find, in the first place, in order to convict the defendant that he is the person that killed the child.   If you have any doubts about that, that ends this case, and your verdict shall be, not guilty.

"If you find that he did strike the child, then the law that I have given you, you should apply to his acts to ascertain whether they come within the definition I have given to you with reference to this being gross, careless, wanton and criminal negligence.   If it is, and if you believe that beyond a reasonable doubt, and if you believe that he is the person that hit the child, your duty is to convict this defendant of the

charge in the information.    Unless you find all of that
beyond a reasonable doubt, it is your duty to acquit
him.    *    *    *

"Now, then, if there is any doubt in your mind as
to this being that car, or whether it was some other
car of some other person at or about that time on
that public highway that it did that—if you have any
doubts, as I say, in the first place, as to this de-
fendant being the man who actually struck the child,
then your duty is to give him the benefit of it and
acquit him.    That ends this case.

"But if you believe beyond a reasonable doubt—
let me repeat again—that he was the person that
struck the child, then you are to determine whether
his conduct was utterly gross, careless and criminal
in its character.

"Now, then, gentlemen of the jury, a child of that
age cannot be guilty of contributory negligence.    Of
course, the child's conduct might be of such a char-
acter on that street there that it would be an accident.
In other words, if a man was driving along on the
street perfectly lawfully and a child should suddenly
dart out and strike the car before the man, within
human possibilities could stop and avoid the accident
or injury, that would be an accident.

"But if you find, gentlemen of the jury, that the
acts on the part of the defendant, if he was the per-
son who actually killed the child were of such gross,
careless and criminal character, then the mere action
of the child, gentlemen of the jury, would not enter
into your consideration, because the child could not be
guilty, at that age, of contributory negligence.    In
other words, it had not the power or the discretion of
age to discern right from wrong.    Therefore, there
could not attach to it the doctrine of contributory
negligence, in order for the defendant to escape the
responsibility of his own, gross, careless, wanton and
criminal acts or conduct.    Now, I think I have made
that plain to you."

The principal complaint here made is that the court
did not in so many words advise the jury that they
had no right to find the defendant guilty unless they

were satisfied that his unlawful act, or his grossly negligent act, if any, was the proximate cause of the child's death.    We have quoted at considerable length from the charge of the court, and we think that, in the absence of any request to charge upon the subject, the charge was sufficiently full upon this branch of the case, and that the jury could not have been misled upon the subject.

The reference to the statutes regulating the operation of a motor vehicle upon a public highway, in the recent case of *People* v. *Harris*, 214 Mich. 145, is applicable here, especially that part of section 4817 relating to cities and villages, and section 4824, 1 Comp. Laws 1915.    Chief Justice STEERE in that case quoted the following language from *People* v. *Barnes*, 182 Mich. 179, 194:

"There seems to be no conflict in the decisions where the respondent is violating some statute, *and* where his manner is negligent and careless; the courts in such cases uniformly hold that he is guilty of manslaughter, if the death of some other person is the result."

We think that the charge sufficiently informed the jury that in order to warrant a conviction in this case it must appear that the death of the person was the result of the conduct of the defendant, in violation of the statute.    We do not think that the rule laid down in the *Barnes Case* was in any way infringed upon or violated by the charge of the court.    Had counsel desired a more explicit charge upon the subject, requests to charge should have been made.

The other subjects have been sufficiently covered in what we have already said.    We are of opinion, in conclusion, that the defendant was duly convicted after a fair and impartial trial, and that the evidence was sufficient to warrant the verdict of guilty of involuntary manslaughter, and that no reversible error ap-

pears, either in the rulings of the court upon the trial, or in the charge to the jury.

The judgment of the court below is therefore affirmed.

STEERE, C. J., and MOORE, WIEST, FELLOWS, CLARK, BIRD, and SHARPE, JJ., concurred.