PEOPLE v. ZIMMERMAN

SEPARATE OPINION

T. M. KAVANAGH, C. J., and BLACK and T. E. BRENNAN, JJ.

1. HOMICIDE — NEGLIGENT HOMICIDE — EVIDENCE — WITNESSES — EXPERTS — AUTOMOBILES — SPEED — DISCRETION.

*Proffered expert testimony, of one not an eyewitness, was not admissible on the question of speed of another oncoming automobile in a prosecution for negligent homicide and the trial judge's refusal to permit such non-eyewitness to give his opinion, of the minimal rate of approach-speed of the oncoming automobile, was not an abuse of discretion; there was no necessity for resort to a non-eyewitness opinion of speed, as there was eyewitness testimony as well as ample proof of physical facts from which the jury could reach a permissible judgment whether the conduct of each driver did or did not amount to negligence and, if so, whether it was causal or remote (CL 1948, § 750.324).*

2. EVIDENCE—WITNESSES—EXPERTS—OPINIONS—DISCRETION.

*Discretion is vested with the trial judge, either to receive or reject the opinions of experts, once the nature of the case and proffered testimony properly invoke such discretion.*

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 9–13, 17, 18, 21] 8 Am Jur 2d, Automobiles and Highway Traffic § 984 *et seq.*

[1, 9–12, 18, 21] Opinion testimony as to speed of motor vehicle based on skid marks and other facts, 29 ALR3d 248.

Opinion evidence as to speed of automobile, 94 ALR 1190.

[2, 22] 31 Am Jur 2d, Expert and Opinion Evidence § 16.

[3, 15, 16, 19] 31 Am Jur 2d, Expert and Opinion Evidence § 14 *et seq.*

[4] 40 Am Jur 2d, Homicide § 91.

[5, 6] 29 Am Jur 2d, Evidence §§ 264–266, 1091.

[7] 31 Am Jur 2d, Expert and Opinion Evidence § 2.

[8] 29 Am Jur 2d, Evidence §§ 251–256.

[14] 31 Am Jur 2d, Expert and Opinion Evidence § 26.

[20] 31 Am Jur 2d, Expert and Opinion Evidence § 14 *et seq.*, 48–51.

3. EVIDENCE—WITNESSES—EXPERTS—ADMISSIBILITY.

*Testimony of an expert witness is admissible only when the ordinary knowledge and experience of mankind will not enable the trier or triers of fact to determine what inferences should be drawn from complex facts previously shown in evidence.*

4. HOMICIDE—NEGLIGENT HOMICIDE—INTENT—NEGLIGENCE.

*Proof of criminal intent is not required in either a civil action for ordinary negligence or a criminal prosecution under the negligent homicide statute (CL 1948, § 750.324).*

5. EVIDENCE — CIRCUMSTANTIAL EVIDENCE — OPINION EVIDENCE — WORDS AND PHRASES.

*Circumstantial evidence, once it is established by a witness having admissible knowledge thereof, constitutes a* thing *or* things, *not* opinions *and, as such, they are inflexible proofs and cannot lie, as can a witness giving opinion evidence who may be interested in the verdict to come.*

6. EVIDENCE—CIRCUMSTANTIAL EVIDENCE—BEST EVIDENCE—DIRECT EVIDENCE—INFERENCES.

*Circumstantial evidence is of the essence of the best evidence rule, and is accepted properly when satisfactory direct evidence of the facts in issue is not available, or, if available, is not susceptible of that process for which jurors are duty-charged exclusively and in particular; the task of drawing inferences from direct proof.*

7. EVIDENCE — EXPERT WITNESSES — OPINION EVIDENCE — DIRECT PROOF — AVAILABLE PROOF — JURY QUESTION.

*Naked opinions of expert witnesses, having no knowledge themselves of essential or controlling facts, are to be rejected excepting only where there is no direct and available proof of such facts thereby maintaining the integrity and constance of the right of trial by jury, and guarding against even partial usurpation, by hired interpreters of fact, of the fact-finding function of juries.*

SEPARATE OPINION

ADAMS, T. G. KAVANAGH, and SWAINSON, JJ.

8. EVIDENCE—WITNESSES—EXPERT WITNESSES—LAY WITNESSES—FOUNDATION.

*Plaintiffs or defendants are entitled to an opportunity to prove their case or disprove their opponent's case by means of all of the evidence available to them—expert or lay—however, if*

*the testimony is cumulative, repetitive, or has no probative value, it may be excluded; otherwise, once the proper foundation has been laid, the testimony should be admitted.*

9. EVIDENCE—OPINION TESTIMONY—WITNESSES—LAY WITNESSES—SPEED—AUTOMOBILES.

*Opinion testimony of lay witnesses with regard to speed has repeatedly been held to be admissible even though the witnesses' opportunity to observe the speed of an automobile has been limited, or the qualifications of the witness to judge speed are little more than his own assertion of his ability to do so, or testimony of the witness borders on the incredible.*

10. EVIDENCE—WITNESSES—EXPERT WITNESSES—LAY WITNESSES—SPEED.

*Considering the speeds at which automobiles now travel, the reliability of lay testimony as to speed, when given as a result of observations, is scarcely such as to obviate proper expert testimony with regard to such an issue.*

11. EVIDENCE — WITNESSES — EXPERT WITNESSES — FOUNDATION — SPEED.

*An expert's special knowledge, the physical facts, and the tests which he conducted to determine the coefficient of friction laid a proper foundation for the admission of his testimony as to speed of an automobile based upon the length of the skid marks.*

12. EVIDENCE — WITNESSES — EXPERT WITNESSES — APPEAL AND ERROR — SPEED — ADMISSION.

*Trial judge did not err in excluding opinion testimony of an expert witness of the speed of an automobile, as any possible error in the refusal to permit the expert to testify as to speed was removed by the admission of the driver of that automobile that he was driving in excess of the 30-mile-per-hour speed limit, that he was going 35 miles per hour, and that he could have been going faster, maybe 40, where no offer was made of proof that the automobile was travelling at a much greater speed and the foundation for an opinion of the expert witness as to speed based on skid marks, plus the results of the impact of the two motor vehicles which collided, was never laid.*

13. EVIDENCE — WITNESSES — EXPERT WITNESSES — FOUNDATION — IMPACT OF VEHICLES.

*Opinion of expert witness based upon the impact of vehicles, would have lacked a proper foundation and would have been inadmissible, in view of that witness' admission that he had*

not had any actual experience in the field of controlled tests with regard to impact of vehicles.

14. WITNESSES — EXPERT WITNESSES — QUALIFICATION AS EXPERT WITNESS.

The expert witness must be an expert in the precise problem as to which he undertakes to testify.

15. EVIDENCE—JURY QUESTION—WITNESSES—EXPERT WITNESSES— AUTOMOBILES.

It is the province always of the jury, made up of common men, to weigh and decide the evidence, but in the struggle to arrive at the truth, the doors may well be opened to them by experts for a proper understanding of the complex facts involved not only in travels to the moon but in connection with the movement of vehicles upon our modern-day streets and highways.

SEPARATE OPINION

WILLIAMS, J.

16. EVIDENCE—EXPERT TESTIMONY—SCIENTIFIC DEVELOPMENTS.

The developments of science constantly influence the expansion of the field for the use of expert testimony and when scientific research and experimentation have developed concepts beyond the point of speculation to the point of demonstrated probability, courts will listen to evidence of such matters on the ground that they are no longer dubious theories but creditable propositions.

17. EVIDENCE—AUTOMOBILES—EXPERT WITNESS—ACCIDENT INVESTIGATION—QUALIFICATION—SKID MARKS—POINT OF IMPACT.

One properly qualified in accident investigative background may testify either from personal observation or from properly authenticated and admitted exhibits that, in his opinion, certain marks are skid marks and that they were made by a given motor vehicle and his reasons therefor; on the same basis and for the same reasons he may point out in his opinion the point of impact.

18. EVIDENCE—AUTOMOBILES—SPEED—OPINION TESTIMONY.

Testimony of a witness offering an estimate of the speed of an automobile, upon the basis of the weight of the cars and the distance and direction they moved after a collision was properly excluded as being no more than speculation where no attempt was made, other than bare assertion of the witness as to his qualification, to indicate that the infinite num-

*ber of points of variability in automobile collisions affords
sufficient certainty of cause and effect to permit scientific speed
estimates.*

19. EVIDENCE—EXPERT TESTIMONY—STATE OF THE ART—UNRECOG-
NIZED AREA OF EXPERTISE.

*The party seeking admission of expert testimony has the burden
of showing the state of the art for any unrecognized area of
expertise such that an expert therein can testify with a rea-
sonable degree of accuracy and predictability.*

20. EVIDENCE — EXPERT WITNESS — IDENTIFICATION — ACCURACY
OF EXPERTISE—CROSS-EXAMINATION—DISCRETION.

*The opposing party can, on cross-examination before the jury,
demonstrate the degree of accuracy or predictability that can
be expected from the expertise in its present state of develop-
ment after the judge, in his discretion, has determined that
the state of the art is satisfactory, that the witness is properly
qualified, and a sufficient foundation laid.*

21. EVIDENCE — AUTOMOBILES — EXPERT TESTIMONY — SPEED —
SKID MARKS — ACCIDENT RECONSTRUCTION — JUDICIAL NOTICE.

*Testimony of a witness offered as an expert on calculating speed
from skid marks was properly excluded by the trial court
because the party seeking to use the evidence did not make
an adequate demonstration of the proper state of the art of
the expertise of automobile accident reconstruction and the
state of that art is not so well recognized either in scientific
and professional circles or in the courts so as to compel or
permit judicial notice to be taken of it where the witness,
on a record out of the hearing of the jury, stated that on
the basis of his calculation from skid marks alone an auto-
mobile was travelling at a certain speed before an impact with
another autombile.*

22. COURTS — EXPERT TESTIMONY — ADMISSIBILITY — COMMON
SENSE STANDARD — DISCRETION.

*The ultimate standard a trial court should use in determining
whether or not an expert witness may testify is to be one of
common sense because the court will not exercise its discretion
in a vacuum but with relation to the accuracy of the expertise,
the skill of the expert, the persuasiveness of the fact founda-
tion laid, and good judicial common sense as to whether the
witness's testifying would be in the best interests of justice.*

Appeal from Court of Appeals, Division 1, Le-
sinski, C. J., and Fitzgerald and McGregor, JJ.,

affirming Recorder's Court of Detroit, Traffic and
Ordinance Division, George T. Murphy, J.   Sub-
mitted October 6, 1970.  (No. 1 October Term 1970,
Docket No. 52,197.)  Submitted on rehearing March
4, 1971.  (No. 43 January Term 1971).   Decided
August 27, 1971.

12 Mich App 241 affirmed.

Roy Zimmerman was convicted of negligent homi-
cide.   Defendant appealed to Court of Appeals.
Affirmed.  Defendant appeals.  Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengowski,* Solicitor General, *William L. Cahalan,*
Prosecuting Attorney, *Dominick R. Carnovale,*
Chief, Appellate Department, and *Luvenia D. Dock-
ett,* Assistant Prosecuting Attorney, for the people.

*Elliott R. Perlman,* for defendant.

On Rehearing (Ordered February 4, 1971).

Black, J.   Defendant-appellant Zimmerman and
his nonappealing codefendant, one Mukalla, were
convicted together of negligent homicide.   The two
were informed against on account of the violent
collision of an automobile driven by Mukalla with
a partially loaded petroleum tank truck operated by
the defendant Zimmerman.   One Anstett, a passen-
ger in the Mukalla car, was fatally injured.

As the causal events began, the truck was pro-
ceeding south on Greenfield in Detroit.   The auto-
mobile was proceeding north on the same street.
Zimmerman turned left toward a private driveway

and had nearly completed his turn when Mukalla's car crashed into the right rear side of the truck. The force of the collision was such that the truck was driven sideways with sufficient force to separate the tank from the truck chassis and overturn it.

The issue of speed of the oncoming automobile was tried out as between the codefendants with as much if not more vigor than the prosecutor displayed in pursuing his duties. For specific details, see Division 1's recount of the trial record (*People v. Zimmerman* [1968], 12 Mich App 241, 245–251).

Zimmerman's conviction was affirmed on appeal. This Court granted leave to review for the purpose of considering two questions: Whether the proffered expert testimony—of one not an eyewitness— was admissible on the question of speed of the oncoming automobile, and whether the trial judge's refusal to permit such non-eyewitness to give his opinion, of the minimal rate of approach-speed of the oncoming automobile, amounted to an abuse of discretion. We agree that no reversible error was committed and therefore affirm.

In *Washburn* v. *Lucas* (1964), 373 Mich 610 this Court criticized the admission of opinion testimony of a like expert witness, the main issue being that of causal negligence. There Justice SOURIS wrote, for our majority (p 625):

"Finally the witness was asked whether he had an opinion 'as to a range of speed of the Lucas car in connection with this accident at the time of the impact?'

"The witness had such an opinion, and gave it, again there being no objection. He was not, as the reader will gather, an eyewitness of the collision. The facts upon which his opinions were founded included a measurement examination of the scene of collision, examination of damage done to 1 of the

cars after the collision, photos and other information given admissibly by other witnesses."

Later we said (p 626) that "the foregoing is written in effort to eliminate future reception in our trial courts of like opinions."

It is well, alleged conflict of *Washburn* with *Dudek* v. *Popp* (1964), 373 Mich 300 considered, that our reasons for elimination of such dispensable testimony should now pass in review. In 1874 Mr. Justice CAMPBELL wrote for the Court (*People* v. *Morrigan*, 29 Mich 4, 7):

"The experience of courts with the testimony of experts has not been such as to impress them with the conviction that the scope of such proofs should be extended. Such testimony is not desirable in any case where the jury can get along without it; and is only admitted from necessity, and then only when it is likely to be of some value."

Then came to our reports, in steady succession, the citations and quotations which the Court gathered in *In re Estate of Astolas* (1935), 273 Mich 189, 193, 194 (*Morrigan, supra,* included). Perhaps the soundest of all reasons, for limiting unto necessity what we loosely refer to as expert testimony, appears in *McNally* v. *Colwell* (1892), 91 Mich 527 (followed expressly in *Vial* v. *Vial* [1963], 369 Mich 534, 537). Quoting *McNally* at 536, 537:

"It is best to limit expert testimony to its proper uses, since it is not now held in the highest esteem; nor has it been found to be free from the infirmities and temptations that belong to human nature. And since a man's opinion cannot be met and tested, as could his testimony to the existence of a fact, expert evidence, while useful in many cases, is dangerous in all, and should be restricted, for the purpose of accuracy in determining the truth, which is the aim of all judicial investigation, to those cases where its

use is well nigh indispensable because of questions of science or skill being involved, in which a special and peculiar knowledge is desired in order to arrive at the truth."

These observations were not new, when written. The reader desiring to pursue them may read with profit entire §§ 390(392) and 391(393), headed "Infirmity of expert testimony," appearing in 2 Jones, Commentaries on Evidence (Blue Book edition, 1913) pp 970–973. The sections conclude:

"We cannot close this section without reproducing from two New York cases *dicta* which are convincing expressions of judicial distrust. 'We may assume, also, that their [the experts'] minds were affected by that pride of opinion, and that kind of mental fascination with which men are affected when engaged in the pursuit of what they call scientific inquiries.' 'He [the expert] comes on the stand to swear in favor of the party calling him, and it may be said he always justifies by his works the faith that has been placed in him.' "

In this case there was eyewitness testimony as well as ample proof of physical facts[1] from which the jury could reach a permissible judgment of the conduct of each driver, that is, whether such conduct did or did not amount to negligence and, if so, whether it was causal or remote. For instance the eyewitness Bloom testified respecting the lateral and longitudinal positions of the respective vehicles as of the approximate time of impact, and to having observed the Mukalla car as it approached the point of collision. He was sworn as a witness for defendant-appellant and testified, upon examination by the latter's counsel:

---

[1] The physical facts were written in detail below; 12 Mich App at 245.

*"Q. (By Mr. Perlman)* What is your opinion as to the speed of that vehicle (that of defendant Mukalla) when you saw it?

*"A.* The car was traveling fast, I thought fifty miles an hour."

Regarding the admissibility of Mr. Bloom's estimate of speed, see *Harnau* v. *Haight* (1915), 189 Mich 600; *People* v. *Schwartz* (1921), 215 Mich 197; *Jones* v. *Detroit Taxicab & Transfer Co.* (1922), 218 Mich 673; *Zylstra* v. *Graham* (1928), 244 Mich 319; *Stehouwer* v. *Lewis* (1929), 249 Mich 76; *Tyler* v. *Weed* (1938), 285 Mich 460; *Hammock* v. *Sims* (1946), 313 Mich 248, and *O'Brien* v. *Wahl* (1953), 335 Mich 601.

In any view of the case there was no necessity for resort to a non-eyewitness opinion of speed, or for even partial encroachment by expert opinion upon the jury's function of finding facts and drawing inferences.

In view of the above we do not discuss the second stated question at length. It is true that discretion is vested with the trial judge, either to receive or reject the opinions of experts, once the nature of the case and the proffered testimony properly invoke such discretion. To the point see cases cited in *People* v. *Hawthorne* (1940), 293 Mich 15, 23 and the observation which, in 1879 was written for the Court by Justice COOLEY in *McEwen* v. *Bigelow*, 40 Mich 215, 217:

"The court is not obliged to receive the evidence of every person called who may appear to have some little knowledge of the business, but who has no personal knowledge of the matters in controversy. He must decide within the limits of a fair discretion whether the experience of the supposed expert had been such as to make his opinions of any value."

It is the *need* for such testimony that counts—a factor that is absent here—and it is admissible only when the ordinary knowledge and experience of mankind will not enable the trier or triers of fact to determine what inferences should be drawn properly from complex facts previously shown in evidence.

The corresponding likeness of a civil action for ordinary negligence, and a criminal prosecution under the statute pursuant to which Mukalla and Zimmerman were convicted (CL 1948, § 750.324 [Stat Ann 1954 Rev § 28.556]), is noted expressly lest our decision be misunderstood and extended beyond the Court's effort in *Washburn, supra* "to eliminate future reception in our trial courts of like opinions." In neither instance is proof of criminal intent required. *People* v. *McKee* (1968), 15 Mich App 382, 385. As the Court observed in *People* v. *McMurchy* (1930), 249 Mich 147, 168 with respect to the cited statute:

"One may be civilly and criminally responsible for the negligence which causes death, though there may be some factors that would discharge one from liability for civil negligence but would not act as a release from criminal negligence. The method of determining negligence in both instances is the same.";

and further (p 170):

"Just as we can ascertain civil liability by certain rules, so also can we determine criminal liability by similar rules."

From this the reader will perceive that we here adopt no broad rule banning expert testimony, or opinion evidence which is based in part or in whole upon facts that are known personally to the witness and verified by him. We simply affirm anew

*Washburn's* bar and apply it to prosecutions brought under the cited statute where, as here, there is no need for an expert opinion or opinions to support or oppose factual proof, already in evidence, which enables the jury and the court to render verdict and pass judgment.

The foregoing does not of course trench upon the admissibility of that class of opinions which, in *Kelley* v. *Richardson* (1888), 69 Mich 430, was written descriptively for the Court by Justice Campbell. His text, to which reference is now made, begins and proceeds (pp 436, 437):

"The phrase 'expert testimony' is not entirely fortunate as designed to cover all cases where a witness may give his opinions. That is done, in a multitude of cases, by witnesses who have no more personal fitness than any one else, but who have been so placed as to have seen or heard things which can only be described to any one else by giving the impression produced on the mind or senses of the witness. These cases are so common that few persons ever think that what are rightly called facts are at the same time no more nor less than conclusions. Thus, impressions of cold or heat, light and darkness, size, shape, distance, speed, and many personal qualities, physical and mental, are constantly acted on as facts, although not uniformly judged by all observers, for the simple reason that the facts cannot be otherwise communicated. Any person can give such impressions without special experience or special intelligence.

"Beyond these every-day matters, known to all men, are things which most, if not all, persons can become qualified to judge by more or less opportunities of observation, local or habitual, but which require no peculiar intelligence. Then there are branches of business or occupations where some intelligence is requisite for judgment, but opportunities and habits of observation must be combined

with some practical experience. This seems to be the beginning or lower grade of what may be properly termed 'experts'; a word meaning only the acquisition of certain habits of judgment, based on experience or special observation."

I vote to affirm.

SUPPLEMENT (December 21, 1970):

This case, having been previously assigned to the writer according to our internal practice, was received on briefs October 6 last. Pursuant to that assignment the foregoing opinion was submitted for consideration of the other Justices November 2. December 2 Justice Adams submitted to us his opinion for reversal, together with his opinion of the like-issue case of *O'Dowd* v. *Linehan,* No 52,402. Some comment upon our manifest differences is now in order.

*First:* Though the honor is enviable, I did not initiate or propose the "need test" which our Brother attributes to me. That was done long before our time, and was continued to release of 1964 *Washburn* v. *Lucas,* 373 Mich 610, by a long line of distinguished lawyers and judges going back to Greenleaf's evidentiary era. And when Justice Campbell wrote in 1874—for the Court—that expert testimony "is not desirable in any case where the jury can get along without it" and is "only admitted from necessity,"[2] he originated for Michigan that same need test which, I submit, is something judicially better than an order *moderne* for free and easy hiring of so-called expert witnesses who, being in the business openly for big fees, offer prepossessed expert opinions for sale to those whose usual concern is that of overcoming the fact testimony of *lay* witnesses.

---

[2] See full quotation, *ante* at p 424.

Whatever the delicate description of such practice may be in legal drawing rooms, once it is put forth from the witness stand without grim cross-examination for the mercenary character thereof (*O'Dowd* is a good example), the result is no less than effectively prejudicial hired testimony, manufactured *for profit* and sold to the few litigants whose pocketbooks are fat enough to supply the wherewithal.

In the foregoing opinion I have quoted Jones at length. Let us hear more, now that the need test has been challenged (a part of the emphasis was supplied by the author; the rest is supplied by the present writer):

"§ 372[374]. *The expert not to decide questions of fact.* Expert testimony being an exception to the general rule of law excluding opinions from evidence, and trenching, as it does, upon the province of the jury, is not to be extended beyond *the necessities of the case.* * * * Whatever liberality may be allowed in calling for the opinions of experts or other witnesses, they must *not usurp the province of the court and jury* by drawing those conclusions of law or fact upon which the decision of the case depends. Although this view has been earnestly criticized, it is sustained by the undoubted weight of authority, and *any lawyer who has had much participation in the actual trial of cases will understand that in many cases trials would become a mere farce if zealous experts were allowed to directly express their opinions upon the very issue to be tried.* It would be impossible to reconcile the conflicting decisions in which the courts have considered the subject of the admissibility of opinions where objection was made that to receive them would allow the witness to trench upon the province of the jury. *It is the general disposition of the courts to restrict the admission of expert testimony within the strict bounds of the necessity on which*

*it is founded.* Indeed, this kind of testimony has always been regarded by conservative jurists with disfavor. Earl, J., has said: 'The rules admitting the opinions of experts should not be unnecessarily extended. Experience has shown that it is much safer to confine the testimony of witnesses to facts in all cases where that is practicable, and leave the jury to exercise their judgment and experience upon the facts proved. *Where witnesses testify to facts, they may be specifically contradicted, and if they testify falsely, they are liable to punishment for perjury. But they may give false opinions without the fear of punishment. It is generally safer to take the judgments of unskilled jurors than the opinions of hired and generally biased experts.'* 2 Jones, Blue Book of Evidence (1913 Bancroft-Whitney edition), pp 908, 910.

A pure coincidence of procedural timing has brought this *Zimmerman* prosecution for negligent homicide, and the wrongful death action of *O'Dowd* v. *Linehan,* Docket No. 52,402, to this Court for submission but a month apart. In each case expert witness William E. Billings was engaged by the defendant to prepare and testify.

In *Zimmerman* Mr. Billings was *not* permitted to testify to the rate of speed of the oncoming Mukalla car, not having been there to see it and the fortuitous events having been observed, in whole or in part, by several testifying eyewitnesses.

In *O'Dowd* Mr. Billings *was* permitted to testify to certain opinions, all based upon *ex parte* "investigations" made by him long after the fatal event. Justice ADAMS has fairly described Mr. Billings' performance in his opinion of *O'Dowd.* I offer no comment upon that performance beyond observing that even Justice ADAMS concedes that Mr. Billings went too far in his zeal to aid the *Linehan* defense. That admission alone is sufficient to justify my objection

to this Michigan-new notion that "an expert in traffic might assist the jury" when, factual proof being available and already received, the jury needs no such assistance.

It is true that the courts of some of the states permit these accident reconstruction experts to testify freely. It is also true that the contending parties occasionally vie for their partisan support; the winner usually being the one with the most cash. Mr. Billings for instance hails from Cleveland. Granting his ability and industry, he has not been over-modest in making his specialty widely known. These cases (*Zimmerman* and *O'Dowd*) are token of the fact.

Last winter Mr. Billings accepted a lead part in Michigan's 21st Institute of Advocacy, conducted March 6, 7. The institutionary topic was "Automobile Product Liability." The official handbook of the Institute portrays the nature of a trial demonstration of *"Portnoy* v. *Anderson* and *Burns."* Mr. Billings, as an "Accident Reconstruction Engineer," was employed by the defendant Anderson to investigate, report and make ready for testimonial "reconstruction." The 3-car collision investigation made of Portnoy, by Mr. Billings for hiring lawyer Hamilton, discloses a unique similarity of *Portnoy* with *O'Dowd.* His report to Mr. Hamilton advised, along with other meticulous detail:

"DESCRIPTION: Traveling east in a 1962 Cadillac Coupe deVille, Driver Anderson was rearended by Driver Burns, also eastbound, in a 1967 Buick Electra 4-door hardtop. As a result of that collision, Anderson's Cadillac was propelled across the center line into a head-on collision with a 1964 Ford Galaxie 500 4-door sedan being driven westbound at about 50 miles per hour by Portnoy.

"(I gather that Burns maintains that Anderson pulled from a parked position on the south shoulder

into the eastbound lane in front of him without warning and without taillights when Burns was so close to Anderson that he did not have time even to apply his brakes, and his front right corner struck the rear left corner of Anderson's Cadillac.  Anderson, on the other hand, says that he was simply driving along, eastbound, at about 45 miles per hour and was rear-ended by Burns without warning.)"[3]   (P 66 of handbook.)

I allude to the March Institute in conjunction with *Zimmerman* and *O'Dowd* solely to sharpen the point that Mr. Billings is a true professional witness whose investigatory talents, and expert opinions to be delivered in court, are for sale.  His integrity as I understand is of the very best.  We must presume likewise with respect to each of Mr. Billings' employers in the *Zimmerman, O'Dowd* and *Portnoy* cases.  Nonetheless his zeal and that of others for the causes of their employers is the taproot of our rule that expert opinions of those who, having no knowledge of the facts in issue, are generally dispensable in Michigan actions for negligence.  There is no need for such opinions when factual proof is at hand and, there being no such need, they should be excluded as an evil rendered excludable by the stark fact of available and ample factual testimony, which the jurors may and should appraise for selection themselves of such inferences as they may choose to draw therefrom.

*To conclude this response:* It seems to me that Justice Adams' opinion is an open if unwitting invitation to joust prosecutions or actions for negli-

---

[3] Prior to the report Mr. Billings wrote lawyer Hamilton (p 69 of handbook):

"In preparation for your examining me as a witness on behalf of Mr. Anderson in the forthcoming trial of *Portnoy* v. *Anderson* and *Burns,* I furnish you herewith a copy of my training and experience record.  I trust this provides you with the information you need.  If not, please let me know."

gence by mutual employment and deployment of professional witnesses, and to spend no little money to obtain their under-oath opinions as outright partisans. This if allowed is bound to become the very iniquity of "manufactured testimony" which, for good reason, the Court deplored generally in *Jones* v. *The President and Trustees of the Village of Portland* (1891), 88 Mich 598, 604.

*Second:* Justice ADAMS' opinion advises at length of that which is so well known as to render it commonplace, first that opinion testimony of speed by foundation-qualifying *eyewitnesses* is admissible, and second that our Court has "on a number of occasions taken note of the reliability of circumstantial evidence."

As to both I rejoin that we are considering here the admissibility of Mr. Billings' proffered *opinion* only, not his opinion of speed based on his own observations of the speeding or nonspeeding vehicle; also that the *opinion* he sought to deliver while on the stand did not by any known legal luminary constitute *circumstantial* evidence. The reason is that circumstantial evidence, once it is established by a witness having admissible knowledge thereof, constitutes a *thing* or *things,* not *opinions.* As such they are inflexible proofs and cannot lie, as can a witness who may be interested in the verdict to come. We said so at least in *Schneider* v. *Pomerville* (1957), 348 Mich 49, 58, and did so in the very context of all present writing, that is to say, an action wherein the issue of causal negligence is alleged and tried.

The fact is that circumstantial evidence is of the essence of the best evidence rule, and is accepted properly when satisfactory direct evidence of the facts in issue is not available, or, if available, is not susceptible of that process for which jurors are duty-

charged exclusively and in particular; the task of drawing inferences from direct proof.

Lay aside, as presently and pertinently bootless, the products liability case, the will contest, the multiple or single automotive or grade-crossing collision cases, the criminal prosecution or, for that matter, the right to prosecute, sue, or defend for or on account of any matter or thing which may be actionable civilly or criminally, *where no witness or admissible demonstrative thing is available to supply the factual proof upon which judicial judgment may be made.* Lay such aside for reason that the expert's utility in all such cases is both *necessary and unavoidable.*

Having done with all such dalliance in today's situation where eyewitness proof of essential facts is present, let us advise the profession again, as was done so helpfully from time to time by our distinguished predecessors, that naked opinions of expert witnesses, having no knowledge themselves of essential or controlling facts, are by our standard to be rejected excepting only where there is no direct and available proof of such facts. In that way we can maintain the integrity and constance of the right of trial by jury, and guard against even partial usurpation, by hired interpreters of fact, of the fact-finding function of juries.

As before, I vote to affirm.

T. M. KAVANAGH, C. J., and T. E. BRENNAN, J., concurred with BLACK, J.

ADAMS, J. (*separate opinion*). I agree with Justice BLACK as to the result in this case. I disagree with the need test, as set forth in his opinion, to determine the admissibility of expert testimony. Plaintiffs or defendants are entitled to an oppor-

tunity to prove their case or to disprove their opponent's case by means of all of the evidence available to them—expert or lay. If the testimony is cumulative, repetitive, or has no probative value, it may be excluded; otherwise, once the proper foundation has been laid, the testimony should be admitted.

The importance of a proper foundation for the admission of such testimony cannot be too much stressed and will be developed later in this opinion. First, however, it will be helpful to look at what this Court has done in its rulings on the admissibility of lay testimony as to speed.

In *Harnau* v. *Haight* (1915), 189 Mich 600, in commenting upon the testimony of a railroad engineer with regard to the speed of an automobile, this Court said (p 609):

"But the testimony of the witness as to what he believed to be the actual speed of the car presents a question of greater difficulty. There is no doubt about Mr. Pearson's competency to judge speed, but his opportunity to exercise such judgment in this case was very limited. He saw the automobile move through a space of only about 20 feet, 'after it shot from behind the tank,' to use his own words, and before the collision with plaintiff. He had no intimation that the automobile was approaching until it came into view from behind the tank, and the night was dark. * * * In the instant case the witness was a railroad engineer of long experience. The court must take notice of the fact that it was part of his business to estimate speed by observation of objects which he was passing while in his engine, both by day and night. He must furthermore be given credit for some knowledge of his own ability in this respect, and he professed to be able to give an opinion in this case. We think the court was not in error in receiving his opinion as to the speed of the car."

In *People* v. *Schwartz* (1921), 215 Mich 197, a witness for the people, a train director, who testified that he was able to judge speed and that he had ridden in automobiles, was allowed to give his judgment as to the speed of defendant's car as it came toward him.

In *Jones* v. *Detroit Taxicab & Transfer Co.* (1922), 218 Mich 673, the testimony of a witness who saw defendant's taxicab coming for 40 feet was held to be admissible. This Court noted that the witness "testified that he had driven a horse and wagon for 12 years, had ridden in automobiles, once taking a trip from Detroit to Chicago, that he had a chance to observe how fast they were going, that he made the trip with two others, that they went '50 or 40 miles an hour,' that he watched the speedometer, that he rides often with friends who have machines."

In *Zylstra* v. *Graham* (1928), 244 Mich 319, this Court commented on the testimony of a witness for the plaintiff as follows (p 326):

"This witness testified he had driven an automobile for five years, that he observed the defendant's machine for a distance of 50 feet before it struck the deceased, and in so doing he was 'able to form a fair and intelligent judgment as to the speed at which it was traveling,' saying: 'My best judgment of his speed was around 25 miles an hour.' The weight of this testimony was for the jury. The court's ruling in receiving it was correct."

In *Stehouwer* v. *Lewis* (1929), 249 Mich 76, a witness, who had never driven an automobile but who had ridden in one very often, testified. This Court noted (p 81):

"She stated that she frequently watched the speedometers, but admitted her inability to tell the exact mileage. She also described the distance the car was from the place of the accident when she saw

it pass her home. She stated, however, that she could tell whether a car was driven slowly or fast, and that she could only estimate the speed."

This Court held that her testimony was proper.

In *Tyler* v. *Weed* (1938), 285 Mich 460, four Justices found reversible error in the exclusion of evidence without specifying the evidence excluded. Justice McAllister, dissenting in part, wrote that the exclusion of the testimony of a 14-year-old boy with regard to the speed of an automobile was erroneous. He said (p 489):

"Plaintiffs sought to show the speed at which defendant was driving at the time of the accident, by Max Ballenger, a boy 14 years of age. This witness testified that he had observed the speedometers in automobiles in which he had ridden and that he could also give an opinion as to how fast defendant was going, based upon his experience in observing automobiles driven on the streets."

In *Hammock* v. *Sims* (1946), 313 Mich 248, this Court held that the trial court erred in denying plaintiff, on redirect examination, the right to give testimony as to the speed of defendant's truck. Plaintiff, a pedestrian, was struck while attempting to cross an icy street. She observed the truck advancing upon her.

In *O'Brien* v. *Wahl* (1953), 335 Mich 601, this Court said (pp 604, 605):

"Plaintiff's principal witness was the driver of the car in which she was riding, and it is the contention of the defendant that his testimony should have been stricken because it was incredible. De Marco testified that immediately preceding the collision he observed the defendant approaching at a distance of 107 paces at an estimated speed of approximately 70 miles per hour. He further said that he continued to observe the defendant's car for a matter

of seconds, but when pressed on cross-examination
to be more definite, said: 'It happened so quickly,
it was almost like the snap of a finger to me.'  Pri-
marily on the basis of this statement, defendant
charges that De Marco's testimony was incredible,
reasoning that it was physically impossible for an
automobile to travel 107 paces in the time required
for the snap of a finger.

\*     \*     \*

"It may well be that his testimony was in part
somewhat unrealistic and distorted, and certainly
the use of the common phrase 'snap of a finger' in
describing the time taken to travel 107 paces was
inaccurate.  Such discrepancies, however, could
properly be taken into consideration by the jury
and should be influential in determining the credi-
bility of the witness."

From these decisions of this Court, it can readily
be seen that *opinion testimony* of lay witnesses
with regard to speed has repeatedly been held to
be admissible even though the witnesses' opportunity
to observe the speed of an automobile has been
limited, or the qualifications of the witness to judge
speed are little more than his own assertion of his
ability to do so, or testimony of the witness borders
on the incredible.

Considering the speeds at which automobiles now
travel, the reliability of lay testimony as to speed,
when given as a result of observations such as took
place in the above cases, is scarcely such as to
obviate proper expert testimony with regard to
such an issue.  In this case, William E. Billings
testified as follows as to his qualifications:

"*A.* I graduated from the Harvard Engineering
School in Mechanical Engineering in 1931, received
my Bachelor of Science Degree.  Then I had a 5th
year at the Havard Business School, receiving my
Master of Science Degree.  I also completed a year

of study at the Harvard Bureau For Street Traffic Research, 1936 to 1937. \* \* \*

"Since 1933 to 1936, I was employed right here in Detroit, Michigan as an engineer for Liberty Mutual Insurance Company and in that capacity, I had the State of Michigan and Ohio in my territory, providing an accident prevention service to commercial vehicle fleets and also to industry.

"Then after, the one year at the Harvard Bureau for Street Traffic Research, 1936 to 1937. Then from 1937 to 1941 still with the Liberty Mutual. I was their Home Office Commercial Vehicle Supervisor. I had charge of administering and developing a service of accident prevention to commercial fleets nationally. This involved commercial vehicle maintenance, brakes, lights, tires, steering, driver-selection and training.

"Then, still with the same company, 1941 to 1945, I was their Boston Massachusetts District Supervision Engineer. I had twenty safety engineers under my direction.

"Then with Liberty Mutual from 1945 to 1947, I was Director of the Traffic Safety Bureau. The purpose of this Bureau is to assist individual car drivers to be better drivers. I wrote leaflets on safe driving, co-authored the Handbook of Traffic Accident Prevention and conducted traffic surveys in such cities as Erie, Pennsylvania, National, New Hampshire, and Hempstead, Long Island.

"Then from 1947 to 1952 I was employed by the Cleveland Automobile Club to head up their Traffic Engineering Department. The purpose of the department is to work with municipalities and help them with their traffic problems and to reduce accidents.

"From 1952 to 1955, I was Transportation Engineer and Administrative Assistant of the Regional Planning Commission of Greater Cleveland, again working with municipalities and assisting them to facilitate traffic flow and reduce accidents.

"From 1955 to 1963, I was employed by the Cleveland Safety Council as their Executive Secretary and Vice President. The purpose of that organization is to prevent accidents and fire in schools, homes, traffic, business and industry.

"Since that time, since the Fall of 1963, I have been working full time on traffic accident reconstruction. * * *

*"I have taught Traffic Engineering at Fenn College at Cleveland and I have lectured on the interpretation of skidmarks in terms of speed at the Police Traffic Institute, conducted by Western Reserve University in Cleveland.* (Emphasis added.) * * *

*"During the last 15 years, I have been called upon by both plaintiffs and defendants and also by municipalities to reconstruct traffic accidents, based upon all known physical evidence. This has involved the interpretation and determination of speed, angle and location of impact; the forces involved in accidents and their effect on the movements of the vehicle and also the people in those vehicles; time; distance; speed; and acceleration studies and the interpretation of photographs by a process known as photogrammetry.* (Emphasis added.) * * *

"I have lectured to professional groups, here in Detroit, Lansing and Saginaw, Michigan, in Pittsburgh, Cleveland, and other locations. In the Fall of 1963, I was on a program of The Practicing Law Institute in New York City. In the Spring of the year, I participated in a seminar conducted by the Institute of Continuing Legal Education, University of Michigan Law School.

"*Q*. During these last fifteen years, how many accidents, on an average, have you investigated?

"*A*. In recent years, it has been averaging about 125 accidents a year. That is the last four or five years. Probably the average prior to that was perhaps 75 accidents a year."

He testified as follows as to his investigation of the facts in this case and as to his area of special knowledge beyond that of the common man:

"*Q*. In relation to an accident involving a tank truck of National Coal and Oil Company and a 1964 Ford XL-convertible, between Lyndon and Eaton Streets, on Greenfield Road in Detroit, Michigan, did you conduct certain investigations relative to this accident?

"*A*. Yes, I did.

"*Q*. When did you do this work?

"*A*. On Monday, March 29, 1965.

"*Q*. What work did you do? Describe what you did, if you will?

"*A*. At the scene of the accident, I did take measurements of the Highway and also the driveway which was important to the scene of the accident or the location of the accident.

"*Q*. (*interposing*.) If I might interject for just a moment, I show you Defendant's Exhibit #2 and ask you if this chart is familiar to you?

"*A*. Yes, it is.

"*Q*. What does this chart represent to you, sir?

"*A*. It does represent a scale drawing of one inch equals ten feet of Greenfield Road, which is north-south in direction, between Lyndon and Eaton Streets.

"*Q*. And is this the area within which you conducted your investigation?

"*A*. Yes.

"*Q*. Now if you will resume telling us what you did?

"*A*. In addition to the measurements that I took, I also made a coefficient of friction test.

"*Q*. Well, first of all, what is the coefficient of friction?

"*A*. Well, the coefficient of friction first, is a decimal fraction. When a car slides on a given pavement surface, with all wheels locked, there is naturally a retarding force bringing it to a stop.

That force is expressed as the coefficient of friction times the gross weight of the automobile.

"To illustrate, if we have a 4000 pound car and our coefficient of friction is, for example, 75/100ths, this means that this retarding force is three quarters of the 4000 pounds, the weight of the car, or 3000 pounds. So the coefficient of friction, expressed as a decimal fraction, does indicate that retarding force as a fraction of the gross weight of the automobile.

"Q. But the coefficient of friction as a principle of physics, is not devoted solely to automobiles, is it?

"A. No, it is devoted to any object sliding over another object. For example, if we had a 100 pound weight on the floor here and I put a scale on it, a draw scale, and pulled it at a uniform velocity, and the scale reads 50 pounds, and the weight is 100 pounds, that would tell me the coefficient of friction between this weight and the floor is 50 pounds over 100 pounds, or one-half. In other words, 5/10ths, in that case.

"Q. But the coefficient of friction, as such, has many uses in industry, does it not?

"A. Yes.

"Q. All right. Now with respect to this test to determine the coefficient of friction, what did you do?

"A. I used a 1960 Oldsmobile that had a calibrated speedometer on it, so that I knew the exact speed. I had a detonator fastened to the front bumper and this detonator shoots a .22 short, with yellow powder on it on the pavement when I apply the brakes and go in an emergency skid. And from a pre-determined speed, in this particular case my speeds were—on the speedometer it was 25 miles per hour in the first case and 24 miles per hour in two other cases—at this predetermined speed, with a detonator on my front bumper, I made three tests at, one at 25 miles per hour and two at 24 miles per hours each and applied the brakes and skidded to

a stop. Then I measured from this yellow powder on the pavement up to the detonator in the stopped position of my car, which gave me the distance of slide to a stop. Knowing the exact speed, I am able to determine this coefficient of friction, through the relationship of speed, braking distance, and that gives it to me, the coefficient of friction.

"*Q.* What was the condition of the road at the time you made your test?

"*A.* The test which I made was in the middle north-bound lane immediately south of the driveway which is shown on the drawing in front of the jury there. The condition of the road at that time in this middle north-bound lane was dry.

"*Q.* What was the result of this test, with respect to determining this coefficient of friction?

"*A.* I found the coefficient of friction to be 815/1000ths.

"*Q.* '815/1000ths'?

"*A.* Yes, or 81/100ths.

\*     \*     \*

"*Q.* Now I show you Defendant Zimmerman's proposed Exhibits #25, #26, #27, #28, and #29 and ask you if you have seen those pictures before?

"*A.* I have seen these pictures before.

"*Q.* When did you see them, sir?

"*A.* Actually, I did have the TV film and insofar as time is concerned, not to take the exact date, but the film was in my costody [*sic*] temporarily and I had them—oh, I've had them probably a month or so. That is the TV film, and these were produced under my direction from the film, from the sections, within the last month.

"*Q.* Very well. Now, do you know the weight of a 1964 Galaxy XL Ford convertible?

"*A.* Yes, I do.

"*Q.* From what do you know that weight, sir?

"*A.* I have taken this weight from the annual statistical issue of Automotive Industries, which is a Chilson Publication of Philadelphia, and generally

accepted in the automobile industry, as being author-
itative.

"*Q*. What is that weight, sir?

"*A*. The shipping weight is 3801 pounds.

"*Q*. What weight?

"*A*. 3801 pounds, is the shipping weight of the
automobile.

"*Q*. Do you know the weight of the driver and
passenger of the Ford vehicle?

"*A*. From the police report, the driver of the
Ford vehicle weighs 160 pounds. That was indi-
cated in my copy of the police report.

"*Q*. Did you employ that weight or other weights
in the investigation that you made?

"*A*. In my investigation, I used the figure of 300
pounds total for the driver and for the passenger.

"*Q*. In other words, that would be indicating that
the passenger weighs about 140 pounds?

"*A*. That's right, yes.

"*Q*. These are minimum weights that you used,
are they not?

"*A*. Yes, sir.

"*Q*. It has been testified to in this courtroom that
a 1956 Ford, C–750, as was involved in this accident,
had a weight of 7100 pounds on the front axle and
11,000 pounds on the rear axle, when loaded with
approximately 910 gallons of oil, as was also testi-
fied to in this case. It was further testified to in
this case as a fact, that the weight of the oil that
was in the truck at the time of the accident was 7.2
pounds per gallon at the time of this accident. Did
you employ those figures in your calculations, sir?

"*A*. Yes.

"*Q*. And what weight did you utilize?

"*A*. 200 pounds.

"*Q*. Did you have a description of the subject-
pavement at the time of the accident?

"*A*. A description of the pavement at the time of
the accident?

"*Q.* Did you have, in making your calculations, a description of the pavement at the time of the accident?

"*A.* Well, actually, in connection with my calculations, I did use my coefficient of friction test and the resulting coefficient of friction and I understand there has been no change in the pavement surface.

"*Q.* Your coefficient of friction was determined on the dry pavement, was it not?

"*A.* Yes.

"*Q.* Did you base your coefficient of friction upon that pavement while dry?

"*A.* Yes.

\* \* \*

"*Q.* It has been testified that a 1956 Ford oil-tank truck was southbound on Greenfield Road at the right of the centerline, on the evening of January 14, 1964. That the oil truck signalled its intention to turn left and proceeded into his turn to enter the driveway on the east side of Greenfield and north of the Royal Optical Company, which is located in this office building at 14600 Greenfield Road.

"With entering the driveway, the truck was struck by a northbound 1964 Ford Galaxy XL Convertible, at the right rear driving wheels. And that the Ford laid down 69 feet of skidmarks \* \* \* in the middle of the northbound lane, as indicated by two parallel lines between 'M' and 'N' on this map (*indicating*).

"And that following the collision, the Ford vehicle was five feet or more, north of the point of impact, facing a direction east of south.

"Now let me stop at this point.

"In examining the photographs that you have, proposed Exhibits #25, #26, #27, #28, and #29, what do those photographs indicate to you with respect to the precise location of the Ford automobile after the collision, with respect to north and south? \* \* \*

"*A.* Referring to Exhibit 28. Comparing the direction of the automobile with the front of the

building behind it, which we know, and from my
observations, as being in a north-south direction,
the Ford was facing somewhat east of south and I
would say at an approximate angle of about 160
degrees rotation from a position initially in a north
direction. In other words, it swung from an initially
north direction at the impact, clockwise, about 160
degrees. So at the moment, as closely as I can
determine, it is facing in a direction east of south
by about 20 degrees, plus or minus 10 degrees.
* * *

"*Q.* Now, if it were toally [*sic*] south, that would
be 180 degrees?

"*A.* Yes, it would have turned through 180 de-
grees.

"*Q.* But it is your testimony that it appeared not
to be totally south, but southeast?

"*A.* Yes, somewhat less than 180 degrees, by
about 20 degrees less.

"*Q.* Did you employ these degrees in arriving at
your calculations?

"*A.* I did use the smaller angle, to be conservative.

"*Q.* The smaller angle?

"*A.* Yes, of 160 degrees, rather than 180 degrees.

"*Q.* Presuming further, that the tank of the truck
was pushed off the chassis of the truck itself and
was north of that point where the truck came to a
stop; and that the truck chassis was facing in a
southwesterly direction in the driveway or on the
apron of the driveway on the east side of Green-
field at the vicinity of the impact. Based upon this
information, the photographs and tests that you
made, and the 69 feet of skidmarks, do you have
an opinion as to the minimum, 'Minimum' speed of
the Ford vehicle prior to making application of its
brakes? * * *

"*A.* Your Honor, before I answer that question,
may I ask Mr. Perlman a question or two? * * *
This is just basic informative information, nothing
to do with speed.

"*The Court:* Go ahead, ask him.

"*A.* (*by the witness.*) I understand the pavement is the same pavement at the time of the accident as it was when I made my tests?

"*Q.* (*by Mr. Perlman* [*attorney for defendant Zimmerman*]). Yes, or a year older.

"*A.* Yes, but it is the same pavement, not resurfaced?

"*Q.* Yes.

"*A.* Was the pavement dry?

"*Q.* It was testified to that the pavement was dry at the time of the accident.

"*A.* And do we know the empty weight of the tank on the truck, including the reel and the meters, exclusive of the oil in the tank?

"*Q.* With the court's permission, it has been stipulated that the weight of that tank, with the reel and hose and meters included, was 4500 pounds. Am I correct, sir?

"*Mr. Bedrosian* [*attorney for defendant Mukalla*]: I stipulate to that.

"*Mr. Bird* [*assistant prosecuting attorney*]: That's all right.

"*Q.* Do you have such an opinion as to the minimum speed of the Ford vehicle prior to the application of his brakes?

"*A.* Yes.

The court rephrased the question as follows:

"*The Court:* Now I want to ask you a question which will make it a little simpler, I think.

"Do you say that you have an opinion based on the weight of this car, and based on an assumption that it skidded 69 feet and hit this truck and knocked the tank off and spun around as you have been informed that it did; do you have an opinion that you think you can accurately tell how fast that Ford was going?

"*A.* The minimum speed, your Honor."

Thereupon the court excused the jury and there followed a long colloquy between court and counsel

as to whether or not Billings should be permitted to give his opinion. During the colloquy, this exchange took place:

"*The Court:* (*interposing.*) Since the jury isn't here, how fast would that car have to be going to skid 69 feet?

\* \* \*

"*A.* But if this car skidded 69 feet to a stop and the car actually moved 69 feet to a stop, its speed would be 41 miles per hour without hitting anything.

"Now, this was not told me, so I would give two answers on this. If the distance was from the beginning of the rear wheel skid, to the end of the front wheel skid, then I have to subtract wheelbase, which is nine and nine-tenths feet. In subtracting the wheelbase, I then come out with the fact that the car skidded actually 59 feet and not 69 feet, and for that, its speed would be 38 miles per hour, if it came to a stop without hitting anything.

"*Mr. Perlman:* That is with no impact?

"*A.* Yes."

After further discussion of the law, this exchange took place between court and counsel:

"*Mr. Perlman:* Your Honor, we are not going to ask this expert for his opinion as to the cause of this accident. The jurors have been given lengths of skidmarks. The jurors have been given—

"*The Court:* (*interposing.*) What you want to tell me is that all you want to ask him is the speed that he thinks the car was going when he put on his brakes, is that right?

"*Mr. Perlman:* There are several questions, sir. Not the speed that he thinks it was going when the brakes were applied, but the minimum speed that it could have been going to lay down those skidmarks. That is number one.

"Number two: The speed of the Ford prior to the impact, the speed of this car prior to the impact,

based upon what he has seen. The speed of the car if it had hit nothing, provided those skids were laid down first, by the front wheels. And the speed of that car if it had hit nothing and the skids were laid down by the back wheels, the beginning of the back wheels. Now these are the four questions."

While there is more to be added from the testimony of Mr. Billings as to his qualifications as a "traffic expert," it is necessary to comment at this point on the offer of proof. It should be noted that the offer of proof was Billings' opinion as to speed, based solely upon the skid marks, and that the testimony he would have given would have been a range of speed from 38 to 41 miles per hour. *There was no offer of proof as to speed deduced from the skid marks and the resulting action of the two vehicles after impact.* The witness' opinion would have been based upon the controlled tests which he made, the laws of physics, and his training and experience in traffic engineering. In *Winekoff* v. *Pospisil* (1970), 384 Mich 260, this Court has held admissible a chart headed "Stopping Distance—Passenger Cars," contained in the pamphlet "What Every Driver Must Know," that is publicly distributed by the Secretary of State. In that case, it was held that judicial notice could be taken of the chart. In this case, the expert's special knowledge, the physical facts, and the tests which he conducted to determine the coefficient of friction laid a proper foundation for the admission of his testimony as to speed based upon the length of the skid marks.

As stated at the outset of this opinion, expert testimony, like any other testimony, may be excluded if it is cumulative or repetitive or has no probative value. In this case, Zimmerman testified that when he made a second observation down Greenfield, he then saw a car approaching and he estimated it to

be 200 to 150 feet away. Zimmerman said that the car "was coming like the dickens, flying." He further testified that had the driver of the oncoming car been going at an ordinary rate of speed, he (Zimmerman) would have had time to have cleared the roadway easy.

Witness Bloom, who was called for defendant Zimmerman, testified that he observed the Mukalla car from his bedroom window and that, in his opinion, it was going "about 50 miles an hour."

Subsequent to the offer of proof by Billings, defendant Mukalla testified. He stated he was going 35 miles per hour. He could have been going faster, maybe 40, not faster than that. He admitted he had 21 moving traffic violations against him at the time, or prior to the time of the accident.

While the testimony of defendant Mukalla was given subsequent to that of Billings, upon review in this Court we consider the entire record. The testimony of Billings would have added nothing to the testimony that had been given by Zimmerman and Bloom. The testimony of Mukalla, subsequent to Billings' testimony, in view of Mukalla's admission that he was driving in excess of the 30-mile-per-hour speed limit, that he was going 35 miles per hour, and that he could have been going faster, maybe 40, removes any possible error in the refusal of the trial judge to permit Billings to testify as to speed in accordance with the offer of proof. Consequently, it must be concluded that the trial judge did not err in excluding this testimony.

Zimmerman's attorney no doubt had intended to elicit from Billings an opinion that the Mukalla car was traveling at a much greater speed than 40 miles per hour. However, at no time was an offer made of proof to this effect and the foundation for an opinion by Billings as to speed based upon the

skid marks, *plus* the results of the impact of the
two motor vehicles, was never laid.

After the colloquy between court and counsel,
and the judge's decision to exclude the opinion
testimony as to speed based upon the length of
the skid marks, the jury was recalled and defendant
Zimmerman's attorney questioned him further as to
his qualifications. Thereupon the attorney for de-
fendant Mukalla conducted cross-examination as to
Billings' qualifications as follows:

"*Q.* Now with respect to your teaching ability:
it is true, isn't it, that most of your experience
around the county would be in lecturing and teaching
the students, pertaining to that which you are about
to testify today, isn't that true, teaching?

"*A.* My lectures to professional groups have been
in the nature of teaching basics of investigation and
traffic accident reconstruction, yes.

"*Q.* Now other than teaching, what experience
have you had?

"*A.* In traffic accident reconstruction?

"*Q.* No, I haven't finished my question yet. What
experience have you had as between the speed of
motor vehicles and impact? Have you ever per-
formed any controlled tests with respect to speeds of
motor vehicles and impacts?

"*A.* I have not involved myself in experiments of
bringing cars together—

"*Q.* (*interposing.*)  First, let me—

"*A.* (*interposing.*)  May I finish?

"*Q.* First let me get your answer. Your answer to
that question is 'no', isn't that true?

"*A.* Sir, may I finish?

"*Q.* First I want the answer and then I will let
you explain all you want. Have you had any actual
experience in that particular field, actually con-
trolled tests with respect to speed of vehicles and
impact? Is your answer to that 'no', sir?

"*A.* My answer to that is 'yes' with regard to speed and with regard to impact, 'no'."

In view of Billings' admission that he had not had any actual experience in the field of controlled tests with respect to impact of vehicles, his opinion based upon the impact of the vehicles, would have lacked a proper foundation and would have been inadmissible.

This is the age of the expert. It is too late to disregard him in the trial of cases. This does not mean that testimony is to be permitted in lawsuits by any so-called expert. There should first be the most searching examination of his credentials. It is for this reason the qualifications of Billings have been presented at length. They reveal that while he may have been an expert in some fields of traffic safety and reconstruction of the causes of traffic accidents, he was not qualified, at least upon the record in this case, as an expert on impacts. No judge would permit a doctor specializing as an anesthetist to testify as an expert on a question of child nutrition in pediatric medicine. The expert must be an expert in the precise problem as to which he undertakes to testify.

It is the province always of the jury, made up of common men, to weigh and decide the evidence, but in the struggle to arrive at the truth the doors may well be opened to them by experts for a proper understanding of the complex facts involved not only in travels to the moon but in connection with the movement of vehicles upon our modern-day streets and highways.

T. G. KAVANAGH, J., and SWAINSON, J., concurred with ADAMS, J.

WILLIAMS, J. (*to affirm*). This case concerns the standards under which an expert witness may tes-

tify. The expertise involved is automobile accident reconstruction. One type of testimony in question is calculation of speed by the laws of physics from skid marks with other known physical factors.[1] The other type of testimony in question is calculation of speed by the laws of physics from skid marks plus impact along with other known physical factors.

The matter assumes importance beyond the instant case because the issue is of first impression in this Court[2] although the matter has been considered several times in the Court of Appeals.[3] Furthermore, in what our Brother ADAMS has called the "age of the expert", it is important that the jurisprudence of this

---

[1] Enumerated *People* v. *Zimmerman* (1968), 12 Mich App 241, 245.

[2] In *Leitch* v. *Getz* (1936), 275 Mich 645, 648, denial of an offer of a witness to estimate speed "upon the basis of the weight of the cars and the distance and direction they moved after the collision" rather than skid marks plus impact was affirmed. This Court without really going into the matter, because it was a minor issue, gave a reason significant to this case. It will be later quoted in the body of the opinion.

The Court did consider a similar matter in *Winekoff* v. *Pospisil* (1970), 384 Mich 260, 269. There this Court took judicial notice of the Secretary of State's pamphlet "What Every Driver Must Know". The relevance of this pamphlet to the instant case is that both the pamphlet and calculation of speed from skid marks rely in part on the coefficient of friction.

Two other cases almost on point are *Siegel* v. *Detroit Cab Co.* (1929), 246 Mich 620, 623, and *People* v. *Ray* (1966), 2 Mich App 623, 630, 631. *Siegel* admitted testimony of an experiment made with a similar car to that causing the accident and almost immediately after the accident to the effect that at 12 miles an hour the car could be stopped within two feet on a dry pavement. However, this Court after stating the facts of the experiment peremptorily dismissed the matter with "this testimony was admissible".

In *Ray* a similar experiment was carried out by a state trooper. Here the Court said "We conclude that the examining magistrate properly admitted the testimony of the experiment of officer Schoenmaker, bearing on the issue of speed". In neither case did the witness attempt to calculate the speed of the offending car. The jury knew the length of the skid marks of the offending car and the witness testified as to the speed of the experimental and the stopping distance. These very rough experiments could have been argued but were not presented and are not particularly helpful from our point of view as they are neither exactly precedential nor instructive in reasoning.

[3] *Anderson* v. *Lippes* (1969), 18 Mich App 281, 286; *Brummitt* v. *Chaney* (1969), 18 Mich App 59; *Snyder* v. *N.Y.C. Transport Co.* (1966), 4 Mich App 38.

state concerning expert witnesses generally be both sound and able to cope with the challenges of the times.

The issues in this case arose out of a prosecution for negligent homicide. The victim was a passenger in the car of defendant Mukalla that ran into a petroleum truck driven by the defendant Zimmerman. The two vehicles were traveling in opposite directions. Zimmerman turned left into a drive across Mukalla's half of the street.

The question of speed became important because defendant Zimmerman maintained that he could have safely completed his left turn in front of defendant Mukalla, had Mukalla not been "coming like the dickens, flying". Only two eyewitnesses testified. Witness Bloom, who saw the Mukalla car from his bedroom window, said Mukalla was going "about 50 miles an hour". Defendant Mukalla personally testified he was going 35 or 40 miles per hour. The speed limit was 30 miles per hour.

Defendant Zimmerman presumably had in mind putting witness Billings on the stand to testify as an expert that Mukalla was traveling at a faster rate of speed than he admitted on the stand. Defendant Zimmerman offered to put witness Billings on the stand as an expert on calculating speed from skid marks. While Zimmerman was attempting to lay a foundation for such testimony the trial court out of the hearing of the jury but on the record asked witness Billings how fast he calculated Mukalla was going. Witness Billings responded that on the basis of his calculation from skid marks alone Mukalla was doing 41 miles per hour. The implication, of course, was that skid marks interpreted only part of Mukalla's speed because his car did not come to a stop by braking alone but through impact with Zimmerman's truck. The implication was that if

Billings were allowed to calculate the additional stopping power as shown by the absorption of impact, the rate of speed would be greater.

The trial court did not rule on the record whether witness Billings could testify on the basis of skid marks and he was never produced. Likewise the effort to produce him to testify on the basis of skid marks and impact was abandoned. Defendant Zimmerman was convicted and appealed.

The Court of Appeals characterized the issues as follows:

"We must consider whether this expert witness may give his opinion as to speed of a vehicle where he has conducted several tests which form the basis of that opinion, and also inquire as to whether speed was material to the issue being tried in this case, i.e., defendant's negligence." *People* v. *Zimmerman* (1968), 12 Mich App 241, 245.

On the first issue the Court of Appeals stated its "willingness to accept such expert opinion evidence as to speed *when it is properly presented*", (emphasis added) citing pertinent authority.[4] However, despite a recess defendant Zimmerman's counsel failed to make that proper presentation.[5] As to the second issue, the Court of Appeals opined "There is no question as to the competence of Mr. Billings to testify as an expert witness on the issue of speed" but then added they could not rule on whether it was necessary testimony as the trial court never ruled on the issue. Defendant's conviction was affirmed.

This opinion will consider the matter in the following order.

---

[4] *People* v. *Zimmerman* (1968), 12 Mich App 241, 246.

[5] One of the problems of this case is that in neither the record, the briefs, nor the arguments are some of the most important and necessary matters presented or discussed. As a consequence, there has been more extensive utilization of judicial notice than would otherwise be necessary or normal.

I. Whether an expert witness should be allowed to state an opinion as to speed of an automobile based either on skid marks or on skid marks plus impact. This involves considering the "state of the art" of the expertise;

II. Whether a proper qualification had been laid for witness Billings to testify as an expert in either skid marks or skid marks plus impact, assuming a satisfactory state of the art;

III. Whether in the record a proper factual foundation had been laid for any expert to testify on speed from either skid marks or skid marks plus impact, assuming a satisfactory state of the art;

IV. Assuming a showing of a satisfactory development of the art and that a proper foundation was laid both as to the witness's expert qualification and as to the necessary data from which to testify, what is the standard of discretion that should control the trial judge in determining whether the witness should be heard.

## I — STATUS OF THE ART

### A — *Law*

2 Jones, Evidence (5 ed), § 435, p 827, lays down a general guideline for our consideration of this matter:

"The developments of science constantly influence the expansion of the field for the use of expert testimony. When scientific research and experimentation have developed concepts beyond the point of speculation to the point of demonstrated probability, courts will listen to evidence of such matters on the ground that they are no longer dubious theories but creditable propositions."

The general principles as to the qualification of a new "expertise" to be considered as the basis for ex-

pert testimony have been stated several times in
recent cases dealing with new arts or sciences:[6]

*People* v. *Becker* (1942), 300 Mich 562, 566, refus-
ing admission of a polygraph test:

"Until it is established that reasonable certainty
follows from such tests, it would be error to admit in
evidence the result thereof."

*People* v. *Morse* (1949), 325 Mich 270, 272, denying
admission of the Drunkometer test:

"Is there general scientific recognition that the
breath test applied by the Harger Drunkometer will
afford an accurate index of the alcoholic content of
the blood?"

*People* v. *Kenney* (1958), 354 Mich 191, 195, 196,
permitting admission of the speedwatch:

"The particular method used in the operation of
the speedwatch apparently is not as complicated as
radar methods, and because of its simplicity has been
adopted by numerous law-enforcement bodies.   The
writings on the subject assert that when properly
operated the speedwatch *accurately records the
speed* of a motor vehicle, *at least reliably so, within
a mile or two per hour."*   (Emphasis added.)

\* \* \*

"It is not necessary that the court find that the in-
strument could not err in order to admit its findings

---

[6] Historically, an observer was qualified to testify because he hap-
pened to have first-hand knowledge of a situation which the jurors
did not have.   This requirement of first-hand knowledge is essentially
a rule of capacity, 2 Wigmore, Evidence (3d ed), §§ 483–487, pp 521–
524.   It became apparent, however, that in some cases a jury was not
competent to draw inferences from certain facts because the drawing
of such inferences would realistically require a special knowledge of
the meaning and interrelationships of those facts, 7 Wigmore, Evi-
dence (3d ed), §§ 1917–1929, pp 1–29.   See also Ladd, Expert Tes-
timony, 5 Vand L Rev 414 (1952).   In order to insure the integrity
of this process the rule developed that one who would testify as to
matters requiring special training or experience must first satisfy
the court that he is in fact an expert in the field, 2 Wigmore, Evidence
(3d ed), § 560, p 640, 7 Wigmore, § 1923, p 21.

as evidence. It is not contended that the readings were conclusive, but that they merely constituted admissible evidence to be weighed by the trier of the facts along with all other evidence to determine the guilt or innocence of the party."[7]

In *Morse,* this Court referred to *Frye* v. *United States* (1923), 54 App DC 46 (293 F 1013). In that case the Court was also considering the "lie detector test", and laid forth a principle of accommodation of law and science (p 47):

---

[7] See also cross-examination by scientific analysis, 3A Wigmore, Evidence (Chadbourn 1970 Rev), § 875, p 642, n 1.

"But where *are* these practical psychological tests, * * * ? There must first be proof of general scientific recognition that they are valid and feasible. The vacuum-ray photographic method, for example, was accepted by scientists the world over, within a few months after its promulgation. If there is ever devised a psychological test for the valuation of witnesses, the law will run to meet it."

See also Ahrens, Scientific Evidence and the Law: Identification, Verification of Verbal Testimony and Physiological Proof, 13 NYLF 612 (1967); n 29 Ohio St LJ 505 (1968); Science & the Law Symposium, 63 Mich L Rev 1325 (1965).

See further narcoanalysis, more commonly known as "truth serum". See 3A Wigmore, Evidence (Chadbourn 1970 Rev), §§ 997, 998, pp 935–946.

In *Lindsey* v. *United States* (CA9, 1956), 237 F2d 893, a psychiatrist was permitted to testify that on the basis of tests and the use of sodium-pentothal (truth serum), it was his opinion that the girl was telling the truth when she repeated her charges of rape on direct examination. On appeal the Court said (pp 895, 896):

"In summary the objection is that the challenged evidence is *incompetent,* in that the trustworthiness and reliability of the sodium-pentothal examination is not recognized and vouched for by scientists * * * ." Id. (Emphasis added.)

"Although narcoanalysis in general, and the sodium-pentothal interview in particular, may be a useful tool in the psychiatric examination of an individual, *the courts have not generally recognized the trustworthiness and reliability of such tests as being sufficiently well established to accord the results the status of competent evidence."* (Citations omitted, emphasis added.)

*       *       *

"Whatever may be the value as an aid to psychiatric examination or otherwise, we cannot affirmatively say that the sodium-pentothal interview is generally vouched for by scientific authority and so entitled to judicial recognition, *through having gained 'general acceptance in the particular field in which it belongs'* * * * ." (Id., citing *Frye* v. *United States* [1923], 54 App DC 46 [293 F 1013, 1014, 34 ALR 145].) (Emphasis added.)

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone (between experiment and demonstration) the evidential force of the (scientific) principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."[8]

---

[8] When a particular scientific *principle* has become generally accepted it may become a proper subject of judicial notice, 9 Wigmore, Evidence (3d ed), § 2580, p 571. For example, in *Richardson* v. *Detroit & M. R. Co.* (1913), 176 Mich 413, at page 423, the Court had occasion to take judicial notice of a principle of physics involving the creation of a vacuum by a rapidly moving body.

2 Jones, Evidence (5th ed), § 412, p 774, relies on *Frye* and makes the following statement:

"Judicial tendency is toward the extension of the field of admissibility of expert testimony which is based upon established or generally recognized scientific principles or discoveries; but it is essential that the principle or discovery from which a deduction is to be made shall have been sufficiently established to have gained general acceptance in its particular field of science."

Before approaching the evaluation of the state of the art in any scientific discipline, it is well to recognize that science, like the law, is not static but is dynamic, and as science from time to time revises its estimations of certainty or adds new fields the law can and should recognize these developments. 3A Wigmore, Evidence (Chadbourn 1970 Rev), § 875, p 641. A rule that may be appropriate to one time and place may seem wholly inappropriate when viewed in the light of subsequent scientific development. An example of a qualified "expert" that might be reconsidered in the light of modern science is the case of *Robbins* v. *Magoon & Kimball Co.* (1916), 193 Mich 200. In an opinion which was undoubtedly appropriate to that age, this Court held that persons accustomed to working with mules may testify that they consider a certain mule dangerous because of the "look in his eye" and his general appearance.

Because of this dynamic character of scientific knowledge, however, early opinions of this Court such as *Robbins, supra,* are not conclusive authority for the proposition that a category of testimony admitted at some earlier point in time, in light of then known or unknown scientific principles, should thereby be admitted in a like case today irrespective of recent developments which may affect the competency or probative value of that testimony.

There are numerous Michigan cases recognizing that skid marks and/or debris may be the basis for expert testimony on point of contact,[9] for direction of travel,[10] or for which vehicle made the skid marks.[11]

The observations of Justice O'Hara in *Dudek* v. *Popp* (1964), 373 Mich 300, 306, 307, serve to delimit where our case law now stands with respect to "automobile accident reconstruction":

"Much has been written upon this general topic in both case law and legal publications. If any trend be ascertainable, it is in the direction of the relaxation of the rule, both as to the subject matter of expertise and in the qualifications necessary to enjoy expert status. Even popular news weeklies have recognized the current reexamination of the question by courts. (See Time, March 20, 1964, The Law.)

"Historically, opinion evidence as to cause and effect in areas of ordinary human experience has been barred, on the reasonable assumption that such determination is attaintable by the jurors themselves. We note, however, a definitive trend toward the acceptance of police officers with extensive experience in accident investigations as 'experts' and in consequence the allowance (within limits) of their opinion evidence. These opinions have included the point of impact (*Zelayeta* v. *Pacific Greyhound Lines* [1951], 104 Cal App 2d 716 [232 P2d 572]), braking and stopping distances (*Kerr* v. *Caraway* [Fla (1955)], 78 So 2d 571).

---

The same would be true as to matters once judicially noticed which are later objected to on the ground that subsequent changes or new scientific evidence renders previously-noticed facts misleading. See *Winekoff* v. *Pospisil* (1970), 384 Mich 260, 269.

[9] *Dudek* v. *Popp* (1964), 373 Mich 300, 305; *Magda* v. *Johns* (1964), 374 Mich 14; *Woolner* v. *Ponicki* (1966), 3 Mich App 590; *LaFave* v. *Kroger Co.* (1966), 5 Mich App 446; *Hoffman* v. *Rengo Oil Co.* (1969), 20 Mich App 575.

[10] *Dudek* v. *Popp, supra,* 303.

[11] *Dudek* v. *Popp, supra,* 303; *Coles* v. *Galloway* (1967), 7 Mich App 93.

"We align ourselves with the authorities which hold that one properly qualified in accident investigative background may testify either from personal observation or from properly authenticated and admitted exhibits that, in his opinion, certain marks are skid marks and that they were made by a given motor vehicle and his reasons therefor. On the same basis and for the same reasons, he may point out in his opinion the point of impact.

\*      \*      \*

"The precise point urged by appellee—that the opinion admitted went to the ultimate fact issue involved—is covered by this rule. [GCR 1963, 605.] The evidence was properly received."

### B — Application of Law to Zimmerman

In determining whether Michigan jurisprudence should now in *Zimmerman* accept skid mark- and impact-based expert testimony relates to the question raised in the Court of Appeals—*"When it is properly presented"*. Does *Zimmerman* properly present a sound scientific basis for reliable, predictable testimony, on the basis of skid marks or skid marks plus impact, or does it not? If it does not, is the expertise so universally recognized that this Court can take judicial notice of that fact?

The only pertinent submission of counsel to support the adoption of a new rule was the following quotation from 2 Wharton's Criminal Evidence (12 ed), § 553, p 416, citing a Georgia appellate court and a Montana case:

"Expert opinion as to the speed of vehicles, such as a speeding automobile, is admissible when based upon mathematical calculations, the condition and position of the vehicle after the collision, or skid marks on the road." (Footnotes omitted.)

This was in the defendant's brief on appeal and the record indicates nothing was submitted at the trial court. Counsel for the people did not attempt to rebut this citation but relied on the argument that on appeal we are reviewing the trial court's exercise of discretion in this matter, which is true but not helpful to this Court in reaching a decision on the merits of a matter of some importance to this state's jurisprudence.

In fact, while defendant's citation is directly in point it is not strongly buttressed in scientific analysis such as should support the recognition of the admission of a new expertise. Let us look somewhat further.[12]

James Stannard Baker is one of the best recognized experts in the area of accident reconstruction. He has had a distinguished career in many branches of the subject. At present he is Director of Research and Development, Traffic Institute, Northwestern University. In his article *Limitations on Accident Reconstruction,* 8 Defense LJ 3 (1960), he had this to say at page 19:

"Accident reconstruction is half art, perhaps, and half science, but it cannot honestly perform the miracles which some seem to think it should. Yet investigators are again and again hopefully presented with reconstruction problems for which no practical solution can be expected from anybody."

He then concluded the article on page 36 as follows:

"Perhaps the time will come when more skill in reconstructing accidents, greater acceptance of opinions based on reconstruction, and better understanding of the limitations of reconstruction by those who want it done will make these techniques more useful."[13]

---

[12] See footnote 4.

[13] Dr. Robert L. Hess, Director of the Institute for Highway Traffic Safety at our own University of Michigan was not able because of

In an article by Andrew J. White entitled *Engineering Research in the Field of Law,* Ins L J 753 (1957), he pointed out that nomographs from which velocity can be calculated from skid mark measurements using various coefficients of friction have become widely distributed even in the legal profession. The article then went on to point out that two universities reached diametrically-opposed conclusions in the development of the coefficient of friction data. Finally he showed that Bureau of Public Roads tests created further doubts as to the accuracy of such nomographs.

In another connection we shall later refer more comprehensively to National Cooperative Highway Research Program Report 37—*Tentative Skid-Resistance Requirements for Main Rural Highways,* H. W. Kummer and W. E. Meyer, Department of Mechanical Engineering, The Pennsylvania State University.[14] However, a statement in that study relative to developing the coefficient of friction, a critical part of the calculation of speed in the skid mark calculation, is pertinent at this point:

"One might object that obtaining all of these data is impractical in field tests. Although this is correct, it is also true that many currently available test results are of limited value precisely because it either was not realized that this additional information was needed or it was not possible to determine all of the pertinent parameters." (P 10.)

While there was no effort to introduce expert testimony on skid marks plus impact, the same kind of

---

time pressures to submit an *amicus* memorandum in this case but graciously responded to some questions. The upshot of these was that even highly-controlled skid mark tests were subject to significant error. If measurements are on the spot basis the error will run appreciably higher. As a result such tests must be approached with considerable caution.

[14] Research sponsored by the American Association of State Highway Officials in cooperation with the Bureau of Public Roads.

showing to qualify the state of the art is in order. In passing it would not be amiss to say the principle of conservation of energy runs into difficulty here because the amount of consumption of energy in the crash process is unknown. Vehicles only theoretically produce the same kind of dents with the same amount of force applied to them, because a particular structural member may be weaker than another for any number of reasons such as faulty welding, rust, *etc.*

On the closely related facts of *Leitch* v. *Getz* (1936), 275 Mich 645, 648, 649, this Court trenchantly states the principles involved in seeking to admit testimony in a new area of expertise:

"Plaintiff presented a witness to offer an estimate of the speed of defendant's car, upon the basis of the weight of the cars and the distance and direction they moved after the collision. The hypothetical question did not cover the situation. No attempt was made, other than bare assertion of the witness as to his qualification, to indicate that the infinite number of points of variability in automobile collisions affords sufficient certainty of cause and effect to permit scientific speed estimates. Without such showing, we could hold the testimony no more than speculation. The testimony was properly excluded. *Hinderer* v. *Railroad Co.*, 237 Mich 232 (26 NCCA 871)."[15]

---

[15] In the case of *Jackson* v. *Trogan* (1961), 364 Mich 148, 156, 157, this Court did not address itself directly to the state of the art but the qualifications of a police officer to testify in a case involving impact, this time without skid marks. A quotation from this Court in *Prove* v. *Interstate Stages* (1930), 250 Mich 478, 490, is significant. The case involved a car-bus accident but no expert witness. There our Court said: "The courts are properly slow to take judicial notice of the phenomena attending colliding forces because, as was said in *Basting* v. *Railroad Co.*, 57 N.Y. Supp. 119:

'The study of accidents shows strange and inscrutable results, sometimes stranger than fiction.' "

## C — *Conclusions*

There must be a showing of state of the art for any unrecognized area of expertise such that an expert therein can testify with a reasonable degree of accuracy and predictability. This is the burden of the party seeking admission for such testimony. Of course, the opposite party is free to cross-examine and offer contrary testimony.[16] All of this should be on the record in case of appellate review. In the event that the judge in his discretion determines that the state of the art is satisfactory, and the witness properly qualified, and a sufficient foundation laid, the opposing party can certainly on cross-examination before the jury demonstrate the degree of accuracy or predictability that can be expected from the expertise in its present state of development.

On the record and from the briefs and arguments in this case, we conclude that Zimmerman in seeking to use opinion evidence as to speed based on calculations critically based on skid marks did not make an adequate demonstration of a proper state of the art. Hence the trial court did not err in not admitting such testimony. This is not to say that a case cannot be made for the use of skid mark speed calculation. We conclude only that so far in this state such a case has not been made and the perfection of the state of that art is not so well recognized either in scientific and professional circles or in the courts of this country[17] so as to either compel or permit us to take judicial notice of it.

As for calculation of speed on the critical basis of skid marks plus impact, no case at all was made. In all probability this is an even more complicated area

---

[16] 2 Jones, Evidence (5th ed), § 437, pp 831–833.

[17] 29 ALR3d 248; 11 Blashfield, Automobile Law and Practice (3d ed), § 431.4, p 610.

than skid marks. Again there is no basis for this
Court to take judicial notice of the state of the art.

## II — QUALIFICATION OF WITNESS

This matter was not really in issue. Since it is a
matter more of fact than law, little time will be spent
on it except to say that from the record the trial
judge might have found an adequate qualification for
skid mark background but less specific support in the
area of impact. See, for example, for comparison
*Snyder* v. *N.Y.C. Transport Co.* (1946), 4 Mich App
38, 45. In general see McCormick, Law of Evidence
§ 14, p 29; 2 Jones, Evidence (5th ed), § 413, p 774;
*Jackson* v. *Trogan* (1961), 364 Mich 148; *Washburn*
v. *Lucas* (1964), 373 Mich 610.

## III — FACTUAL FOUNDATION

Whether there was a proper foundation for the
presentation of expert testimony is also largely a
matter of fact. But it is a matter of importance if
the scientific calculations on which the expert opinion
is to be based are to be accurate. The scientific
formula used in connection with calculating speed
from skid marks is the coefficient of friction.

The factual basis laid for the coefficient of friction
was certainly subject to vigorous cross-examination
if not outright disqualification. In this connection,
the following quotation on page 9 and 10 from the
previously referred to National Cooperative High-
way Research Program Report 37, *Tentative Skid-
Resistance Requirements for Main Rural Highways,*
prepared by H. W. Kummer and W. E. Meyer, De-
partment of Mechanical Engineering, The Pennsyl-
vania State University, is significant:

"The foregoing discussion should be persuasive
evidence of the necessity of identifying the test con-

ditions under which friction data are obtained when
dealing with either the adhesion or the hysteresis
component. When pavement friction is measured
with a rubber slider or by means of a slipping or
skidding tire, adhesion and hysteresis generally oc-
cur together, because no pavement surface is so
smooth as to eliminate hysteresis or so well lubri-
cated as to render adhesion trivial. Under these cir-
cumstances it becomes mandatory to state the test
conditions and assure their constancy throughout the
test.

"The statement 'We measured a friction coefficient
of 0.63' is basically meaningless if it is not accom-
panied by the following information:

"1. Surface characteristics, of which surface
geometry (macro- and microscopic roughness of the
mineral particles and/or binder) and the type and
amount of lubricant are the most important.

"2. Rubber characteristics, of which the elastic
and damping properties are the most important.

"3. Operational parameters; that is, load or pres-
sure acting on the slider or tire, sliding speed, and
temperature of both surface and rubber.

"One might object that obtaining all of these data
is impractical in field tests. Although this is cor-
rect, it is also true that many currently available test
results are of limited value precisely because it either
was not realized that this additional information was
needed or it was not possible to determine all of the
pertinent parameters."

What was the testimony in this case as to surface
characteristics? "I understand there has been no
change in the pavement surface." "Your coefficient
of friction was determined on the dry pavement, was
it not?" "Yes."

There was also testimony indicating that the wit-
ness tested the road in his own car with its own tires
of a brand not specified at 25 miles an hour, although
he later calculated that the car in question was trav-

elling at least 40 miles an hour without considering whatever additional speed might be factored in because of impact calculations.

What does this all mean? Surface characteristics: among other things not only was the road nine months older when the expert witness tested it, but the accident occurred in January and the test was run in September. In January there was probably a saline film on the road, which would not be true in September. Rubber characteristics: the record does not indicate whether the expert witness's tires were of the same brand as the car in the accident or that they had the same amount of wear.[18] The hysteresis factor refers to the reactions of different types of tires with different degrees of hardness at different rates of speed.[19] The last factor, of course, makes the relationship of the speed of the test car to the accident car important.

"Dry" is a generally inadequate approximation of what is required. "Thermal history" is what is needed, and where there is not adequate comparison of thermal history in the accident and test days there can be significant variation in the coefficient of friction.[20]

No issue was made of whether or not a proper foundation was laid for introducing testimony, so

---

[18] "Preferably, (the expert) would conduct the test over the *very same roadway*, under weather *conditions* as *nearly the same as possible*, and with the *same vehicle*. If the same vehicle is not available, circumstances can be nearly duplicated by placing the tires from the involved vehicle on the testing vehicle. *As a minimum* he would use the *same brand of tires* and ones of substantially the *same condition*." 1 Blashfield, Automobile Law and Practice (3d ed), § 3.3, p 40 (emphasis supplied).

[19] *Op. cit.*, Kummer and Meyer p 9. 1 Blashfield, Automobile Law and Practice (3d ed), § 3.3, p 39:

"* * * a more important factor is the composition of the tire itself."

[20] 1 Blashfield, Automobile Law and Practice (3d ed), § 3.3, p 39. Random selection of test date may result in very large variation. University of Michigan Institute for Highway Traffic Safety.

there is no need for a finding or holding here. The matter was considered, however, for the reason that the probable inadequacies in the foundation are indicative of the complication of the expertise sought to be used and the number of almost uncontrollable variables which tend to make the reliability of prediction from anything except the most exhaustive laboratory tests something less than sure. As a matter of fact, the most closely-controlled tests seem to be subject to a considerable possibility of appreciable error. This, of course, goes to the state of the art.

## IV — JUDICIAL DISCRETION

Assuming the trial court has found that the state of the art of the expertise in question satisfactorily passes the test, that the witness is fully steeped in the expertise and that an entirely-adequate foundation has been laid on which the witness can base his opinion, the determination as to whether or not the witness may testify is still within the trial court's discretion. Obviously, the trial court must exercise his discretion according to some reasonable standard. What is the appropriate standard?

The Michigan cases suggest two standards which out of context at least show discernible difference. One standard arises from an opinion of Justice COOLEY in *McEwen* v. *Bigelow* (1879), 40 Mich 215, 217. Justice COOLEY spoke as follows:

"The court is not obliged to receive the evidence of every person called who may appear to have some little knowledge of the business, but who has no personal knowledge of the matters in controversy. He must decide within the limits of a fair discretion whether the experience of the supposed expert had been such as to make his opinions of any value."

What Justice COOLEY emphasizes is whether the proposed testimony will be "of value".

Another standard arises from an opinion of Justice Campbell in *People* v. *Morrigan* (1874), 29 Mich 4, 7. Justice Campbell spoke as follows:

"The experience of courts with the testimony of experts has not been such as to impress them with the conviction that the scope of such proofs should be extended. Such testimony is not desirable in any case where the jury can get along without it; and is only admitted from necessity, and then only when it is likely to be of some value."

What Justice Campbell emphasizes is whether the proposed testimony is "necessary" and if necessary, will it be of value.

These two standards on their face read quite differently. However, another factor must be considered. The three tests mentioned above are theoretically separate and apart from this standard of discretion, but in reality they cannot but have a meaningful effect.

For example, it is argued that since in the instant case there were eyewitnesses who could testify to the speed of the car, it would be unnecessary to call upon expert testimony. Suppose, however, that all the facts remained the same but instead of an automobile accident reconstruction expert, there fortuitously had been a traffic officer tracking the Mukalla car with a "speedwatch" with acknowledged excellent accuracy. Would it still make sense to argue that because there were two eyewitnesses who could testify to speed that the traffic officer should not testify, although on the basis of his expertise he would have the right answer? Is it, or is it not necessary to call the witness who can solve the problem? It would be hard on the basis of common sense to argue against using the officer and his expertise. The jury would probably not understand why they could not get what would seem like the definitive word, and perhaps the

appellate court might not either. However, if the expert were backed by an expertise that was reputed only 50% accurate, the necessity of calling on him would seem to be much less obvious, although in either case the testimony might be said to be of value depending upon what credibility the eyewitnesses were thought to have.

The following analysis may in part help explain the difference in standards suggested by Justices Cooley and Campbell. Justice Cooley's opinion dealt with the possible admission of the expert testimony of a plumber, and every husband who was tried at the request of his wife to make a toilet stop running knows first hand, that the help of an expert would be of value, or for that matter necessary. Justice Campbell on the other hand was dealing with possible testimony of detectives "as to whether it was possible to commit the robbery in the manner charged". Probably most would agree with Justice Campbell "The subject is not a proper one for experts".

The last statement indicates the interrelationship between the qualification of the expertise and the discretion of the court. While the derived rule may relate to the court's limits of discretion, the underlying basis was that there was no acceptable expertise. One is tempted to wonder, however, what the trial judge would have done if the proffered witness had been Sherlock Holmes.

In our opinion, the ultimate standard is going to be one of common sense. The trial court will not exercise its discretion in a vacuum but with relation to the accuracy of the expertise, the skill of the expert, the persuasiveness of the fact foundation laid, and good judicial common sense as to whether the witness's testifying would be in the best interests of justice.

The proposed Federal rule on this subject creates a reasonable and practical standard and we adopt it as a guide.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by special knowledge, skill, experience, training, or education, may testify thereto." Rule 7-02, Testimony by Experts, Proposed Rules of Evidence for the US District Courts, 46 FRD, 161, 314.

This test is adequately described by the following excerpt from the Advisory Committee's notes to Rule 7-02:

"Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of *assisting the trier.* 'There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.' Ladd, *Expert Testimony,* 5 Vand L Rev 414, 418 (1952). When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time. 7 Wigmore § 1918." 46 FRD 161, 315 (emphasis added).[21]

The decision of the trial court to disallow the introduction of proffered expert testimony, especially in view of the inadequate showing on the state of the art and the inadequate foundation of fact laid, was not error.

For the several reasons above considered the Court of Appeals is affirmed.

---

[21] See also, 2 Jones, Evidence (5th ed), §§ 411, 412, 438, pp 771, 772, 833.