**GREAT LAKES GAS TRANSMISSION CO., Plaintiff-Appellee**

v.

**GRAYCO CONSTRUCTORS, INC., and Seaboard Surety Company, Defendants-Appellants.**

**No. 73–1948.**

United States Court of Appeals, Sixth Circuit.

Nov. 8, 1974.

Certiorari Denied Feb. 24, 1975. See 95 S.Ct. 1330.

James R. Hale, Miller, Johnson, Snell & Commiskey, Grand Rapids, Mich., Donald V. O'Brien, Joseph Bleich, New York City, and O'Brien & Trittipo, Walter E. Trittipo, Jr., Chicago, Ill., for defendants-appellants.

John C. Jones, J. Warren Eardley, Grand Rapids, Mich., John M. Rady, Gen. Counsel, Great Lakes Gas Transmission Co., Detroit, Mich., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, WEICK, Circuit Judge, and WALINSKI,* District Judge.

WALINSKI, District Judge.

This is an appeal from a verdict and judgment of $1,838,544.56, recovered by plaintiff from the company to whom it had awarded a contract to construct part of its pipeline project. After the work was completed and the pipeline had been placed in service, the pipeline ruptured for substantial distances on two separate occasions, thereby causing damages which required repairs and which resulted in loss of revenue.

On this appeal, error is charged in the admission of certain opinion evidence and in the rejection by the Court of evidence which would show that plaintiff had recovered substantial benefits in its rate allowance by changing its acccounting procedures whereby the loss was passed on to plaintiff's customers. Appellants also assign as error the lack of competent evidence to support the verdict on the issues of negligence and breach of warrranty; that plaintiff's witness improperly construed the contract between plaintiff and its gas supplier; that the verdict is excessive; and that defendant was prejudiced by the trial court's jury charge. We find it necessary only to discuss the first two contentions.

Plaintiff is a Delaware corporation which was formed as a joint venture by two major North American natural gas distributing and pipeline companies: TransCanada Pipelines, Ltd., and American Natural Gas Company. The company was formed to build and operate a new and larger gas pipeline to extend across northern Minnesota, Wisconsin, the upper peninsula of Michigan, and through the lower peninsula to Sarnia, Michigan, where it would connnect with TransCanada's facility at the international boundary. The construction of the line was divided into two phases, the first of which was completed in 1967 and ran from Sarnia to Farwell, Michigan. The second phase began in 1968 and involved several pipeline construc-

* The Honorable Nicholas J. Walinski, Judge of the United States District Court for the Northern District of Ohio, sitting by designation.

tion companies, one of whom was the defendant.

Defendant Grayco entered into a contract with plaintiff in which Grayco was to build a 60-mile section of the pipeline running from eastern Wisconsin into the upper peninsula of Michigan. Grayco's obligation extended from unloading the pipe from railroad cars; clearing and excavating the land; welding pipe sections together; cleaning, priming and coating the pipe; laying the pipe into the ground and filling in the trench; final testing and purging of the pipeline; and "all things necessary to completely construct a gas transmission facility ready to be operated * * *." (Pl. Ex. #2.) The steel pipe used in the line was, under the contract, to be capable of withstanding pressures of 65,000 pounds per square inch without rupturing or being deformed.

Grayco began work in the spring of 1968 and was to complete the section by November 1, 1968. Work was substantially finished by late October, 1968, in spite of unusually wet and cold weather which began in September. As part of its testing procedures, Grayco performed a hydrostatic test of the pipeline at pressures up to 105% of the specified strength with the pressure maintained for a 24-hour period. These tests were successful at the two sites with which we are here concerned, the pipe surviving long tests in excess of 100% of the specified minimum strength. Great Lakes assumed beneficial occupancy of the Grayco section by November 1, 1968, although certain rough cleanup work continued until severe weather conditions forced a halt to this activity on November 13, 1968.

Great Lakes began gradually after November 1, 1968, to build up the pressure in its new line to the allowable maximum. In spite of some "start-up" problems in the first weeks, the pipeline was operating by mid-December so as to enable Great Lakes to meet the requirements of certain gas transmission contracts.

However, on December 27, 1968, the line suddenly ruptured at milepost 403.2 (measured as 403.2 miles from the western terminus of the line) causing approximately 850 feet of pipe to be split and violently thrown out of the ground. Great Lakes immediately began repairs using Grayco equipment which had been stored in the vicinity for the winter. By January 10, 1969, the line had been completely repaired and gas pressure was gradually increased.

Great Lakes' tranquility was to be short-lived, however. A few hours after gas transmission had resumed, the line ruptured again, this time at milepost 400.2 (nearly three miles west of the first rupture). Approximately 380 feet of pipe was split and thrown out of the ground, again completely severing the pipeline. Repairs were quickly begun, using Grayco equipment still in the area. On January 17, 1969, the line had been completely repaired and was restored to operation.

As a result of these two ruptures, the United States Department of Transportation ordered the operating pressure on the line to be severely limited between the nearest compressor stations on both ends of the Grayco section. Great Lakes undertook to make an internal examination, known as a Linalog survey, of the portion of the pipeline which was now suspect.

While awaiting completion of the necessary preparations for the Linalog survey, Great Lakes sought and was granted permission to raise its operating pressure, although still not near its planned capacity. After the Linalog survey had been completed, all pressure restrictions were completely removed, and the line began operating as planned on May 29, 1969.

When Great Lakes assumed possession of the line on November 1, 1968, it had changed its accounting procedures from the "under construction" mode to an "in-service" mode. After the ruptures occurred, Great Lakes reverted to the "under construction" system until May 29, 1969. The effect of this rever-

sion was to place all of plaintiff's costs during the period of repairs and pressure restrictions into its "plant" account, which was in turn used to determine its rate base by the Federal Power Commission.

The case was tried by a jury on three theories: negligence, breach of contract, and breach of implied warranty of fitness. Plaintiff submitted a total damage claim of $2,444,193.94 to the jury which returned a verdict as to all counts of $1,838,544.56, apparently reflecting a decision not to permit recovery of the revenue lost during the period of pressure restriction.

Defendant's first major ground for appeal is that the district court erred in permitting plaintiff to introduce certain opinion testimony as to the cause of the two ruptures. In this regard, defendant also charges error in permitting the Order of the Department of Transportation of January 17, 1969, to be introduced because it also is alleged to have contained an opinion as to the cause of the ruptures which is assailed as being hearsay. We do not believe that prejudicial error was committed in either instance.

The opinion testimony to which appellant refers is that of the witnesses Holstead and Etchegary. Holstead is the executive vice president and general manager of plaintiff. According to his testimony, he had been in the pipeline business for at least twenty years at the time of the ruptures. He also had nearly ten years experience in the design, engineering and supervision of construction of gas pipelines while he was employed by TransCanada. While Holstead had a bachelor's degree in civil engineering, he testified that he had acquired through his experience, a working knowledge of metallurgy and fracture mechanics. Moreover, it was uncontroverted that he had visited the sites of the two ruptures within hours after their occurrences and had examined the damaged pipe before it was removed. He testified at great length as to the specific facts which he personally discovered as to the type of fracture involved and its place of origin on the pipe. It was shown that the pipe had been badly gouged at the location of both ruptures and that this gouging had been inflicted after the welded pipe had been coated and wrapped, after the pipe had been laid in the ground and the ground filled in, and after the hydrostatic testing had been completed. Both sites were lowland areas which, because of the unusually wet weather, were soft and muddy. Heavy construction equipment was seen near both sites. Several witnesses saw a bulldozer driven back and forth across the pipeline itself, apparently while engaged in rough clean-up work.

With this foundation, Holstead was asked to give an opinion as to the cause of the pipe failure. Before he was permitted to answer, the trial judge cautioned the jury as follows:

"THE COURT: Ladies and Gentlemen of the jury, I am going to permit the witness to answer the question.

"What weight and credit you give to the testimony of a person who is qualified as an expert, that is a person who has some expertise beyond that which a normal person possesses, is up to you.

"It depends upon his background and his own statement and knowledge and expertise in the area concerning which he purports to testify to.

"Experts may give opinions, but the opinions may be considered by you only to the extent that you find the witness is qualified to act as an expert in that area and only insofar as it goes concerning factual matters forming the basis for his opinion which are established by other evidence or independent evidence in the case.

"I will be instructing you more fully on this at the conclusion of the trial.

"In the meantime I will permit him to answer the question and therefore the objection is overruled."

Holstead then testified that in his opinion the gouges were inflicted by mechanical means on the pipe. He was then asked to give his opinion as to what mechanical means could or would have inflicted the gouges. Over the objection of appellants and after voir dire examination outside of the presence of the jury, the court permitted Holstead to answer. Before answering, the court cautioned the jury that the question as to what actually inflicted the gouge was for the jury to decide. The trial judge said:

> " * * * The witness may testify from whatever expert knowledge he may have of the process as to what would or could have caused it, but the ultimate question of what caused it being one for the jury to decide."

The witness then answered that the gouging could have been inflicted by the pipe having been struck by some piece of heavy construction equipment. It is this opinion which appellant charges was prejudicial error.

In support of its contention, appellant cites the decisions in Washburn v. Lucas, 373 Mich. 610, 130 N.W.2d 406 (1964); and People v. Zimmerman, 385 Mich. 417, 189 N.W.2d 259 (1971), which it argues are controlling. In these cases the Michigan Supreme Court ruled that opinions of causation in negligence cases where the subject matter of the inquiry is of such a character that it may be presumed to lie within the ordinary experience of all men of common education, whether offered by experts or lay witnesses, are uniformly excluded as invasive of the province of the jury. It should be noted that both cases involved an opinion as to the cause of an automobile accident when there was already evidence before the jury in the nature of an eye-witness.

Putting aside the applicability of the maximum admissibility rule, Rule 43(a), Federal Rules of Civil Procedure, Patterson v. Norfolk & Western Ry. Co., 489 F.2d 303 (1973), we think these Michigan holdings are clearly distinguishable from the case at bar and therefore are inapplicable. As previously noted, the Michigan rule arose in the context of opinions by investigating officers as to the causation of an auto accident, a subject for which many, if not all, of the causal factors lie within the ordinary experience of all men and women of common education. We do not feel that the potential sources for gouging $3/8''$ thick steel pipe, specially made to the gas transmission company's specifications, can be said to lie within the ordinary experience of most potential jurors. Hence, we find no error in the admission of Holstead's opinion testimony, particulary in view of the scrupulous cautionary instruction given by the trial judge.

What we have said applies with equal vigor to the similar testimony of the witness Etchegary. In any event, appellant failed to make any objection at the time of Etchegary's testimony, thereby rendering it unavailable as grounds for appeal. Hines v. Prudential Ins. Co., 357 F.2d 726 (6th Cir. 1966); Talley v. Mitchell, 275 F.2d 244 (6th Cir. 1960); Bryant v. Sears, Roebuck & Co., 435 F.2d 953, 956 (4th Cir. 1970).

Appellants also argue that it was error to admit into evidence the January 17, 1969 order of the Department of Transportation in which the Acting Director of Pipeline Safety claimed to have met with representatives of plaintiff, the Michigan Public Service Commission and the Federal Power Commission for the purpose of deciding what regulatory measures were necessary in view of the two ruptures. The Director based his order in his letter, limiting the operating pressure in the gas pipeline of Great Lakes, on, *inter alia,* the following findings of fact:

> "5. Preliminary investigation indicates that this [the first] rupture resulted from external damage to the pipe during construction.
>
> " * * *
>
> "8. As in the case of the first rupture, preliminary investigation indi-

cates that this [the second] rupture resulted from external damage to the pipe during construction.

"9. During the course of construction there were five test ruptures which resulted from prior external damage to the pipe."

Appellant argues that it was error to permit the jury to have these "findings of fact" in that they are hearsay, and bases his argument on Derrick v. Blazers, 355 Mich. 176, 93 N.E.2d ˙909 (1959).

Plaintiff-appellee argues that the order was admissible under Rule 43(a), Federal Rules of Civil Procedure. *See* Patterson v. Norfolk & Western Ry. Co., *supra.* Moreover, Great Lakes argues that the defendant told the jury in its opening statement that the order was issued because the ruptures in the pipe had been lengthier than previously experienced. Grayco then contended that the pressure reduction which had been ordered resulted only because of doubts about the particular pipe used in constructing the pipeline and not because of anything Grayco had done. Therefore, it is argued, this statement sought to attack plaintiff's damage claim for revenue lost due to the order restricting operating pressure, and Great Lakes was thus required to show that the order had been issued without any reference therein to the length of the ruptures. Plaintiff also claims it offered the order for the purpose of showing the basis on which it acted in an effort to mitigate its damages since the order left open the chance of getting the restrictions lifted.

When defendant objected to the introduction of the letter, plaintiff explained to the court that it was being offered for the purposes previously outlined. The court then instructed the jury as follows:

"This is one of those pieces of hearsay evidence that I was telling you about before you were sworn as jurors, after you were impaneled, ladies and gentlemen, where an exhibit can be received for one purpose but not for another because that is hearsay. * * * This is the letter that directed [plaintiff to restrict its operating pressure]. To that extent it is admissible and proper, to prove what the Department of Transportation did. It contains, however, certain findings which are to be received by you only as the understanding of the writer of the reasons, but not as proof themselves of the reasons, or as truth of the facts therein. That has to come elsewhere in this trial, if it be true at all. But I am going to allow it to be received for the purposes set forth, not for the truth of the specific factual matters. You may consider that this is what the writer himself believed as the basis for his action, but not that those facts are in fact true. * * * *."

The witness was then permitted to read the letter containing the order to the jury.

■■■ We find no error in the admission of this letter. It bears repeating, in this context, that the hearsay rule excludes extrajudicial statements *only* when they are offered to prove the truth of the matter asserted. Patterson Dental Supply Co. v. Wadley, 401 F.2d 167 (10th Cir. 1968); Carantzas v. Iowa Mut. Ins. Co., 235 F.2d 193 (5th Cir. 1956). Where, as here, the trial judge has carefully instructed the jury as to the purposes for which a letter containing hearsay may be admitted, and where there is substantial evidence elsewhere in the record bearing on the subject which is contained in the hearsay, we hold there is no prejudicial error in the admission of the letter. *Cf.* Gray v. L. J. Navy Trucking Co., 475 F.2d 545, 550 (6th Cir. 1973).

The second major ground for appeal is that the court erred in excluding evidence, which appellant sought to introduce, that plaintiff has realized benefits which exceed its damages. After the two ruptures had occurred, plaintiff reverted to an accounting procedure whereby it was able to capitalize the

costs of repairs as well as certain items, such as interest expense, which would normally have been charged as expenses deductible from income. Grayco thus argues that plaintiff's capital account, now containing the repair costs and other usual expense items, will be used by the Federal Power Commission to set the rates which Great Lakes will charge its customers and that these rates will be sufficiently higher so as to permit plaintiff to recapture these extraordinarily capitalized costs. But for the accident, plaintiff would have been unable to revert to the "under construction" mode of accounting, and therefore plaintiff realized a benefit which far exceeded its damages; or so it is argued.

In his opinion, the trial judge offered three reasons for excluding Grayco's evidence:

1) The public policy against permitting a wrongdoer either in tort or contract to pass the consequences of his wrong over to the public in general and thus escape responsibility for them;

2) The proof fails totally to show that, if any benefit was conferred, it was done so by defendant itself; and

3) The benefit itself is entirely conjectural and speculative.

■ While each of these reasons may be sufficient by itself, we feel that the first and last are particularly compelling within the context of this case. What appellant ignores throughout its argument on this point is that its position if accepted would mean that a tortfeasor should escape liability any time his victim can recover his damages from the general public. We do not read the relevant Michigan holdings to sanction such a policy. In Motts v. Michigan Cab Co., 274 Mich. 437, 264 N.W. 855 (1936), the Michigan Supreme Court cited with approval the following:

" * * * a defendant owes to the injured compensation for injuries the proximate cause of which was his own

negligence, and that their payment by third parties cannot relieve him of this obligation, and whether the motive impelling their payment be affection, philanthropy, or contract, the injured is the beneficiary of their bounty and not him who caused the injury." [quoting Roth v. Chatlos, 97 Conn. 282, 116 A. 332, 334 (1922)]. 264 N.W. *Id.* at 858.

In *Motts,* the Michigan Court held that payment of a salary to an injured person by his employer during the time he is unable to work because of his injuries is not a ground for mitigation of damages to be paid by one who caused the injury. The plaintiff in *Motts* sought to recover, *inter alia,* loss of earnings even though his employer had continued his salary. Hence, we are of the opinion that the policies which underlie Michigan's collateral source rule operate to deny appellant's contentions as to the evidence it sought to introduce.

Moreover, it hardly needs showing that plaintiff operates in a highly regulated industry, and the rates it charges its customers are controlled by the Federal Power Commission. *See* 15 U.S.C., § 717 et seq. If it turns out that any recovery by plaintiff in this case would in effect be a double recovery because plaintiff had already been recovering damages through the rates it charges, then the Federal Power Commission has the power on its own to adjust plaintiff's rates accordingly. Therefore, any benefit allegedly conferred on plaintiff by defendant is indeed conjectural and speculative since the Federal Power Commission could effectively take it away following any decision by this Court. We therefore conclude that the trial court's ruling on defendant's proffered evidence was not prejudicial error.

Finding no error in any of appellant's remaining contentions, we conclude that the judgment of the district court must be affirmed in all respects.

Affirmed.